THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* LENELL COE, Defendant-Appellant.

First District (5th Division)   No. 78-195

Opinion filed December 22, 1978.—Rehearing denied January 22, 1979.

Walter La Von Pride, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and Mary Ellen Dienes, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

After a bench trial, defendant was convicted of rape (Ill. Rev. Stat. 1973, ch. 38, par. 11—1) and acquitted of armed robbery. (Ill. Rev. Stat. 1973, ch. 38, par. 18—2.) He was sentenced to a term of four years to four years and a day on the rape conviction. This appeal raises the following two issues: (1) Whether reasonable doubt exists where the trial court's findings in a two count indictment are so logically inconsistent that they are against the manifest weight of the evidence; and (2) whether the defendant was denied due process as a result of prejudicial information independently acquired by the trial judge prior to the filing of post-trial motions and the entry of judgment. We affirm on both points.

Janice Thompson, the complainant, testified that on the evening of February 25, 1976, she visited a friend and her 26 year old grandson. At 9:15 p.m., he walked with her to a cab. She took the cab to the Dan Ryan "L" train on Lake Street, and then took the train home. At approximately

9:30 p.m., she left the train at the Cicero Avenue station and began walking towards her home at 4925 West Hubbard. While she was heading westbound on the south sidewalk of Hubbard Street, she noticed that someone was following her. She later identified the man as defendant. She said that she had just passed an alley when she noticed her pursuer on the corner of Hubbard and Cicero. She quickened her pace and began walking in the middle of the street. He continued to follow her and eventually began running after her. She began running too, however, he caught up with her. She said that he caught up with her within two car lengths. He grabbed her by the neck and pointed a gun at her head, just above the left ear. At this time, even though there were lights on Hubbard, she was unable to see his face because he was behind her.

He told her to keep quiet and then pulled her off the street. They went into a gangway between two houses. He took her to the back of one of the houses and ordered her down a stairwell. When she refused, he again grabbed her around the neck and ordered her into the alley behind the houses. He then took her into a vacant warehouse with his arm still held tightly around her neck and with the gun still visible. Although the alley had the usual lighting, she still was in no position to see his face or to observe anything unusual about him. .

After they had entered the warehouse, he took her purse and again told her to keep quiet. She could not see him because it was dark in the warehouse and she had been told to stoop down with her back towards him. All that she could see were items which were being thrown from her purse. During his search of the purse, he asked her if she had any money. She told him that she did, but he did not ask her where it was. However, later that evening, she noticed that four dollar bills which she had placed in her checkbook were missing. While he was going through her purse, complainant attempted to stand. He pointed the gun at her face and again told her to keep quiet. Shortly thereafter, complainant heard a noise outside of the warehouse. When she tried to call out, he put his hands over her mouth and told her to keep quiet. He kept his hands over her mouth for about ten minutes. Then, when the noise subsided, he continued his search of her purse. When he had finished and had put everything back into the purse, he searched in her bra and panties.

A short time later, he told her to stand up and take off her coat. When she refused, he brought out the gun again and pointed it at her. She then took off her coat. When she stood, she was able to clearly see his clothing because he was standing in the doorway and the alley light was shining into the warehouse. She noticed that he was wearing green pants, black Army boots, and a green Army-like jacket with a zipper up front. She could not see his whole face because he was wearing a knit multicolored cap pulled down on his face. However, she did note that he had a goatee.

After she had removed her coat, he told her to lie down on a mattress which was on the floor of the warehouse. He then placed the coat over her face, removed her clothes, and raped her. A short while later, she heard a ripping sound which she said was similar to the sound made when removing a paper from a stayfree minipad. She said that she was wearing a minipad that evening. Later she tried to remove the coat from her head, but her assailant would not let her. He told her to keep her hands at her side at all times.

After a five-minute period of silence, he then began talking to her. He first threatened her. He said that he knew where she lived and that he would come after her if she called the police. She testified that he could have gotten her address from a number of items in her purse, including her checkbook. She testified that he did go through her checkbook. After the threat, he then apologized to her. When she nervously asked him why he raped her, he initially did not answer her question. He began talking about her, stating that she had a job, a checking account, and money. He then said that he raped her because she had a job. When she asked him why he did not look for a job, he said that he could not find one. He added that he had no luck with a job or with his girl friend. He said that she had turned away from him. During the conversation, complainant said that she remained very nervous. After about 20 minutes, he allowed her to take the coat off her face and to put on her clothing. She said that she still could not see his face because he had turned his back towards her. When she had fully dressed, he gave her back her purse and offered to walk her home. She said that she could not go home looking like she did and said that she had to go to a phone. He then left the warehouse with her.

They walked eastward through the alley towards Cicero. For the first time, she was able to see defendant's face clearly under the alley lights. She said that she had never seen him before. He walked alongside of her onto Cicero. They passed a number of passing cars and people standing outside of a tavern. She did not want to go into the tavern to make her phone call because the people in there appeared to be drunk. She said that she did not say anything to the people outside of the tavern or to any other people they passed because she was afraid.

She testified that as they walked southward on Cicero, she did not notice anything unusual about defendant's walk. She did notice that he wore a gold digital wristwatch and a gold ring on his finger. She also repeated her description of his clothing, adding that he wore a multicolored hat which exposed some hair on the back of his head. She described the hair as being natural or kinky. She said that defendant did not have his gun drawn while they were walking. However, she did say that he had one of his hands in his pocket and that he was walking alongside of her.

Eventually, they arrived at a laundromat which was attached to a 24-hour store. The store was brightly lit and complainant was once again able to see defendant's face clearly. They went into the laundromat together. She did not talk to any of the people in the store. She went directly to a phone and made her call with defendant standing next to her. She told defendant that she was calling her brother. Complainant testified that she called her friend, Nancy Zick, and told her that something was wrong. She could not say much more than that because defendant remained very near to her for part of the conversation. After about five minutes, she noticed that he had left. She then told Zick where she was at that time.

Complainant testified that while she was waiting for Zick, she did not call the police because she was very nervous and she did not have enough money to call them. When Zick arrived, they went to the police station and made out a report. After making the report, she led the police to the warehouse where the rape had occurred. When they entered the warehouse, they saw a minipad, a wigpiece, and a newspaper on the ground. She said that those items belonged to her. After they had finished their visit, the officers took complainant to a hospital.

The next day, she left her house at 11 a.m. and went to a corner grocery store to make a telephone call. While she was there, she saw defendant walking in the store. She saw his face clearly and noticed that he was wearing the same clothes as the night before except that he was now wearing a solid colored hat. He apparently did not see her. When he left the store, she walked to the entrance and watched him for about five minutes. She then called the police. When the police arrived, she gave them a description of defendant and then rode with them as they searched for him. They saw him bending over a car at Hubbard and Cicero. She told the officers that he was the man who had raped her. They then phoned for another unit to pick up defendant.

Nancy Zick testified that at approximately 11 p.m. on February 25, 1976, she received a phone call from the complainant. Complainant told her that "something terrible had happened" to her. When Zick asked her what had happened, complainant repeated her statement that "something terrible had happened." Zick then asked her if she had been raped and she said that she had. She also told Zick that she had not called the police because her assailant was still with her. After awhile, complainant told Zick that the man had left and she then gave her the address to the laundromat.

When Zick arrived at the laundromat, she noticed that it was "very brightly lit." She saw complainant sitting on the window ledge. She noticed that complainant looked sad and that her hair was messed and her

clothes were rumpled. Zick drove her to the police station to report the rape.

Officer Richard Blackman testified that he was assigned to complainant's rape on February 26, 1976. He said that she gave him a description of her assailant. She said that the man was a "male Negro about five seven, 170 (pounds), 22 to 23 years old, wearing a green jacket, green pants, and multi-colored knit cap." After he had spoken with her, he drove her to the vacant warehouse where the rape had occurred. He testified that the lighting conditions were not very good. However, he said that as he approached the doorway of the warehouse he could see a mattress on the floor because an alley light cast a reflection on the entrance. After he had entered the warehouse, he observed a newspaper on the floor. Later, he drove the complainant to a hospital. A medical examination revealed that there was sperm in the complainant's vagina.

Officer Robert Thorne testified that on the afternoon of February 26, 1976, he had been assigned to meet another squad car at the corner of Hubbard and Cicero. He went there and talked to the complainant. He said that he could remember her telling him that her assailant wore green pants. She later told him that he also had a silver watch. After the conversation, Thorne went to 433 North Cicero and observed a man, later identified as defendant, working on an automobile. He arrested defendant. When he was arrested, defendant was wearing green pants.

When Thorne first saw defendant walk 20 feet, he did not notice anything unusual about the way he walked. Later, when he saw him walking in the police parking lot, he noticed that defendant walked with a "little dip" or a slight hesitation. On cross-examination, Thorne said that after the arrest his partner told him that defendant had an artificial leg.

Officer Frank Musial testified that he investigated the rape on February 26, 1976. He said that he went to the warehouse with the complainant and discovered a sanitary pad, a woman's wig and a ballpoint pen, all of which he inventoried. He said that he did not know if any fingerprints had been found on any item that the complainant had in her possession. He said that he believed that she told him that her assailant was wearing a silver watch.

Defendant, Lenell Coe, testified that he had been working at his father's auto shop, Rex Auto Sales, for a period of eight to nine years. He said that he had been working there in February of 1976 until he became sick sometime around the 19th of February. He was having problems with his teeth. On either the 18th or the 19th, he called a dentist who prescribed some medication for him. On the 20th, he went to see Doctor Karr. Karr could not pull the teeth because they were too infected, but he did prescribe some medication to deaden the pain. Defendant said that he

returned to Karr on the 23rd and was given another prescription. He had the prescription filled the same day. Debra Buckner, his girl friend, was with him at this time. He said that she was also with him when he finally had the tooth pulled after he was arrested.

Defendant testified that in addition to his teeth problems, he was suffering from a touch of the flu during the period of February 20 and February 27. He was bed-ridden in his home during that period. He was living at that time in the first floor apartment of a two-flat owned by his father. He lived with his brother and his brother's wife and children. His parents and sister lived in the second floor apartment.

While defendant was bed-ridden, Buckner was a constant visitor. He had known her for three years and had gotten quite serious with her. She became pregnant in late 1975. Sometime in December of 1975 he began to look for an apartment which they could share. Instead, he found a house and he was buying it at the time of the trial.

Defendant testified that he remained in his apartment all day on February 22, 1976. He spent most of the day watching television. He took a bath at 9 p.m. He saw several members of his family that day. His mother came down to check on him at 6 p.m. Sometime between 10 and 10:30 p.m., his former wife called him at his parents' phone, and he saw his father when he went up to talk to her. At 10:15 or 10:20 his mother and sister came down to his apartment to give him some food. Also, at 12:30 a.m., he spoke to his brother when he returned from work. He said that he went to sleep sometime between 12:30 and 1 a.m.

On February 26, 1976, defendant left his bed to see his dentist. He had an appointment at 1 p.m. Prior to going to see the dentist, he went to his father's shop to borrow some money. He then went to a grocery store to buy a carton of orange juice. Then he returned to his father's shop and he helped his father tighten a battery cable. He said that he was not officially working on that day.

Defendant testified that his height was 5 feet 11 inches and that on February 26, 1976, he probably weighed 135 or 138 pounds. He said that he was wearing his hair in a permanent and that it was straight when he was arrested. He described his clothing on that day as green pants, a wind breaker, a turtleneck sweater, some boots, and a green hat made out of bluejeans. He said that he was wearing a silver watch and that he was not wearing any ring.

Defendant also testified that he had an artificial limb. He lost his right foot in 1968. Since he obtained the artificial limb, he had never done any running. He said that if he tried running on the foot he would experience a great pain because the artificial limb pushed against nerve endings. He said that he knew this because when he was fitted for the limb he attempted to run in physical therapy. He also stated that his artificial limb

broke in December of 1975 and he had to tape it. He could not run on it while it was taped.

Rudolph P. Crouch, a pharmacist, was shown two prescription bottles. He identified the bottles as having contained prescription drugs which he had filled for defendant. The drugs were authorized by Dr. Karr and the labels on the bottles were dated February 23, 1976.

Debra Buckner, defendant's girl friend, testified that at the time of trial she was living with defendant and their daughter in their new house. She said that they had moved into the building in March of 1976. She said that her relationship with defendant was very intimate in February of 1976. She had spent much time with him during that month while he was sick. She said that he became sick about a week before he was arrested. He was suffering from a cold, a high temperature, and an abscess on his tooth. She had been with him when he had gone to see a dentist. She had spent the day with him on February 24, and he had driven her home that night. She said that when he drove her home he was feeling better but he had not completely recovered. She stated that he had had his tooth pulled by the 24th of February.

Delphia Coe, defendant's mother, testified that defendant lived in the first-floor apartment of a building which she and her husband owned. She said that defendant had been working at her husband's auto shop for seven years but that he had not worked for three or four days prior to his arrest because he had a toothache and a cold. On February 25, 1976, at approximately 4:30 p.m., she said that she saw defendant when she checked to see if he was feeling any better. At 6:30 or 7 p.m. she had her daughter bring defendant a bowl of soup. At 9 p.m. she sent down a bottle of soda. Also, sometime between 10 p.m. and 11 p.m., she said that defendant came up to her apartment to answer a phone call from his ex-wife. He was wearing pajamas at that time. She could not remember the specific time of the call, but she said that the 10 o'clock news was on the television.

Elizabeth Jackson, defendant's hair stylist, testified that she thought that she had given defendant a permanent in the third week of February. She did not keep records but she said that people who get permanents generally return every two or three weeks and defendant was due to return around that time. Also, she said that she knew that he had come in sometime in February because he had done some work on her car about a week after his permanent.

Jackson said that once a person had received a permanent to straighten his hair, he could not change back to a natural for five or six months. However, she was shown a mug shot of defendant taken at the time of his arrest, and she described the hair at the base of his neck as being "frizzy" or "slightly kinky." She said that if a person stayed in bed

for a week with a high fever, the waving process would come out of his hair and the kinkiness in the hair would return. The kinkiness would return only to certain areas of the hair. Once this person took a shower, the hair would straighten out.

OPINION

Defendant contends that he was not convicted beyond a reasonable doubt because the trial court's findings in the two count indictment were so logically inconsistent that they were against the manifest weight of the evidence. The trial court's findings in this case were that defendant was guilty of rape but not guilty of armed robbery. In making these findings, the court commented that:

> "I think that the basic criminal objectives of the defendant was to commit a rape. The taking of the money from the purse of the victim was at best an afterthought and at best committed the offense of robbery at that particular instance. That the elements of armed robbery, taking money from the person by threatening force, the use of eminent [sic] force in my opinion was not sufficiently established. However, I feel that all of the elements of the rape were clearly established, based on the clear and convincing testimony of the complaining witnesses and all of the other evidence that I considered."

Defendant states that there was not adequate evidence adduced by the State to prove him guilty beyond a reasonable doubt, and the inconsistent findings may have resulted from a compromising stand taken by the trial judge.

Initially, we note that many of the cases cited by defendant and the State in support of their disparate stands on the issue of inconsistency involved jury trials. The case before us was a bench trial. In a bench trial, a reviewing court may more readily reverse because of inconsistency. (*United States v. Maybury* (2d Cir. 1960), 274 F.2d 899; *People v. Pearson* (1973), 16 Ill. App. 3d 543, 306 N.E.2d 539; *People v. Hyman* (1972), 8 Ill. App. 3d 382, 290 N.E.2d 627.) However, since we find no inconsistency in the trial court's findings, we need not discuss the distinctions between a jury and bench trial.

Rape is committed if:

> "(a) A male person of the age of 14 years and upwards * * * has sexual intercourse with a female, not his wife, by force and against her will * * *.
>
> (b) Sexual intercourse occurs when there is any penetration of the female sex organ by the male sex organ." (Ill. Rev. Stat. 1973, ch. 38, par. 11—1(a), (b).)

Armed robbery is committed when "[a] person * * * violates Section

18—1 while armed with a dangerous weapon." Section 18—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1973, ch. 38, par. 18—1) provides:

"(a) A person commits robbery when he takes property from the person or presence of another by the use of force or by threatening the imminent use of force."

Defendant's argument is that the logical inconsistency arises out of the fact that complainant's testimony appears to have been considered credible on the issue of rape but incredible on the issue of armed robbery. He states that force is a common element of both armed robbery and rape and that the only force alleged by complainant was defendant's use of a gun. Since this was the only force alleged by complainant, the court apparently believed that the complainant's testimony on the existence of the gun was proof beyond a reasonable doubt on the crime of rape but not proof beyond a reasonable doubt on the crime of armed robbery. This he contends is logically inconsistent.

In reviewing the complete record of this case, we disagree with defendant's contentions that the existence of the gun was not proven beyond a reasonable doubt on the armed robbery charge and that the only force alleged by complainant was the use of a gun. As was noted earlier, the trial court stated that the reason why it found defendant not guilty of armed robbery was because the use of imminent force was not sufficiently established. This is not necessarily the same as a finding that the existence of the gun was not proven beyond a reasonable doubt. In fact, to prove armed robbery one must prove both the use of force or imminent force and the use of a dangerous weapon. Ill. Rev. Stat. 1973, ch. 38, par. 18—2.

Complainant's proof also alleges force other than the use of a gun. She testified that when she was going up Hubbard Street defendant chased her, and when he caught up with her he "grabbed" her by the neck. He told her to keep quiet and then pulled her off the street. He went into a gangway with her and when she refused to go down a stairwell he again grabbed her around the neck and ordered her into the alley. Then, he led her into the vacant warehouse with his arm still held tightly around her neck. All during the time they were in the darkened warehouse, he ordered her about, oftentimes telling her to keep quiet. When they heard a noise outside the warehouse, she tried to call out, but he placed his hands over her mouth and kept them there for about 10 minutes. Before and after the rape he ordered her about. He first ordered her to take off her coat. Then he told her to lie on the mattress. He placed her coat over her head and raped her. After the rape, he would not let her remove the coat until after about a 20-minute conversation with him. Additionally, Nancy Zick testified that complainant acknowledged the fact that she had been raped by the man who was with her while she was talking with Zick.

Complainant later identified the man as defendant. Zick also testified that when she saw complainant at the laundromat she noticed that complainant looked sad and that her hair was messed and her clothes were rumpled. They both then went to the police station to report the rape.

■ ■ The record indicates sufficient evidence of force to convict on a charge of rape. It also indicates sufficient evidence of force to convict on a charge of armed robbery. We do not know why the trial court found that force was not sufficiently proven on the charge of armed robbery. However, the issue of force ultimately involves a question of the credibility of the witnesses. (*People v. Barksdale* (1976), 44 Ill. App. 3d 770, 358 N.E.2d 1150.) Credibility of witnesses is determined by the trier of fact because the trier of fact heard the testimony and observed the demeanor of the witnesses. On this record, we see no reason to reverse the court's finding. Therefore, since we believe that there was sufficient evidence to support a finding of force on the crime of rape, we hold that there was no logical inconsistency.

■■■ Furthermore, we hold that the State produced evidence adequate to prove defendant guilty beyond a reasonable doubt. To sustain a conviction for rape, the testimony of the complainant must be clear and convincing or corroborated by other evidence. (*People v. Thompson* (1978), 57 Ill. App. 3d 134, 372 N.E.2d 1052; *People v. Brown* (1977), 50 Ill. App. 3d 348, 365 N.E.2d 907.) We find complainant's testimony to be both clear and convincing and corroborated by other evidence.

In particular, we note the strong identification testimony of complainant. Complainant had ample opportunity to observe defendant under good lighting conditions. (*People v. Williams* (1975), 33 Ill. App. 3d 219, 338 N.E.2d 133.) Although complainant was not able to observe her assailant prior to the rape because of poor lighting conditions or because her eyes were covered by her coat, she was able to observe him clearly afterwards. She testified that she was first able to clearly observe his face under the alley lights after they had left the warehouse. Defendant walked alongside of her while she was walking down Cicero looking for a place to make a telephone call. When they arrived at the laundromat she once again had a good opportunity to observe his face because the store was well-lit. They went into the store together and he stayed with her for about five minutes. We find this testimony clear and convincing on the question of identification.

Defendant contends that complainant's identification testimony should be disbelieved because of certain discrepancies in her description. After the rape, complainant told Officer Blackman that she noticed that her assailant's height was 5 feet 7 inches and his weight was 170 pounds,

but that she did not notice anything unusual about the way he walked. Defendant's height is 5 feet 11 inches, his weight was either 135 or 138 pounds at the time of the incident and he has an artificial foot.

Similar discrepancies were present in *People v. Brown* (1977), 50 Ill. App. 3d 348, 365 N.E.2d 907. In *Brown*, the complainant gave a physical description which was 4 inches and 25 pounds off the actual height and weight of defendant, and she made no mention of anything unusual in her assailant's walk even though defendant had a foot injury. The court found that these were matters which went to the weight to be given to the identification and were to be determined by the trier of fact. (50 Ill. App. 3d 348, 353-54, 365 N.E.2d 907, 910-11.) In the present case, we believe that the discrepancies were also matters for the trier of fact. With regards to defendant's foot, we note that two witnesses for the State testified that they did not notice anything unusual about defendant's walk the first time that they saw him walking. Also, even though defendant testified that he could not run without experiencing severe pain accompanied by swelling of his left leg, there is no testimony that he could not run at all. Besides, complainant testified that defendant only had to run two car lengths to catch up with her.

Complainant's testimony was corroborated in part by Zick's testimony. Zick testified that the complainant called her at 11 p.m. on February 25, 1976, and acknowledged that she had been raped. When Zick arrived at the laundromat to pick up complainant, she noticed that complainant looked sad and that her hair was messed and her clothes were rumpled. Zick and complainant went directly from the laundromat to the police station to report the rape.

Defendant argues that complainant's outcry was not immediate. However, we find that the facts indicate that she made her outcry as soon as possible. Before her telephone call to Zick, she was unable to notify anybody of the rape because defendant was her constant companion. He walked alongside of her as she walked from the warehouse to the laundromat. Also, although she did not see the gun at any time during this walk, she testified that defendant had his hand in his pocket.

Finally, although defendant offered an alibi for his whereabouts on the evening of February 25, 1976, the trial court apparently disbelieved it. Since the trial court was in a better position to weigh credibility and assess the evidence than we are, we will not reverse the decision of the trial court unless we find the proof "so unsatisfactory as to justify a reasonable doubt of defendant's guilt." (*People v. Brown* (1977), 50 Ill. App. 3d 348, 354, 365 N.E.2d 907, 911.) We see no reason to make such a finding in this case. Therefore, we find that defendant was proven guilty beyond a reasonable doubt.

Defendant's second contention is that he was denied due process as a

result of prejudicial information independently acquired by the trial judge prior to the filing of post-trial motions and the entry of judgment. After defendant had been found guilty of rape, he made a statement to his attorney in the lockup to the effect that "the time doesn't mean anything to me, I can handle the time without any problem." A bailiff overheard this statement and while he was relating this statement to another bailiff, the trial judge overheard the conversation. Although defendant admits that the trial judge was an "unwitting party," he states that the receipt of the information is *per se* prejudicial and requires a new trial. We disagree.

■■ Every instance in which extraneous or unauthorized information reaches the trier of fact does not require reversal or a new trial. (*People v. Holmes* (1978), 69 Ill. 2d 507, 372 N.E.2d 656.) The court's determination rests upon whether defendant may have been prejudiced. In the present case, several things ought to be noted. First, the exact meaning of defendant's statement is subject to different interpretations. It may be an admission of guilt, it may signify that defendant has resigned himself to his fate. Next, the receipt of the information occurred *after* defendant had been found guilty. The trial judge did not seek out the information, but rather he unwittingly overheard it. He immediately brought this to the attention of the defendant and defendant had adequate opportunity to argue the issue during his motion for a new trial. Defendant presented his arguments and the court denied his motion, stating that it found that all the evidence proved defendant guilty beyond a reasonable doubt. Lastly, in entering judgment, the court sentenced defendant to four years to four years and a day. The minimum sentence required on a conviction of rape is four years. (Ill. Rev. Stat. 1973, ch. 38, par. 11—1(c).) We find that considering all of these circumstances, defendant has not been prejudiced by the court's receipt of the information. Therefore, we hold that defendant was not denied due process.

For the foregoing reasons, we affirm the judgment of the trial court.

Affirmed.

SULLIVAN, P. J., and MEJDA, J., concur.