THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
KENNETH WILLIAM RAKER, Defendant-Appellant.

Fourth District   No. 15071

Opinion filed September 6, 1979.

TRAPP, J., dissenting.

Gary R. Thompson, of Bloomington, for appellant.

Ronald C. Dozier, State's Attorney, of Bloomington (Robert C. Perry and Robert J. Biderman, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE CRAVEN delivered the opinion of the court:

Following a jury trial, the defendant, Kenneth William Raker, was found guilty of rape, armed robbery, aggravated battery, and kidnaping. He was subsequently sentenced to concurrent terms of 17 years for rape, 12 years for armed robbery, 7 years for kidnaping, and 5 years for aggravated battery. On appeal, the defendant contends, *inter alia*, that he was not proved guilty beyond a reasonable doubt. We agree, and reverse his convictions.

The testimony at trial revealed that the complaining witness arrived at her apartment building at approximately 11:30 or 11:35 p.m., on January 25, 1978. As she was walking from the parking lot to the entrance of her apartment building, she observed an individual running toward her. When he reached the door, he grabbed her arm and she turned toward him and observed his physical characteristics and clothing. She described the individual as a young man of medium build with a thin

mustache. She noted that he appeared to be a little taller than her height of 5 feet 7 inches and that his face was "broken out." She noted that he was wearing a blue knit stocking cap which was pulled down to about eye level and that he wore a dark blue, waist-length jacket, jeans, and light brown leather gloves.

As she turned toward the man, he drew an automatic pistol and told her to drive him out of town. When she refused, he struck her on the head with the gun. She was knocked to the ground momentarily but the attacker helped her up and forced her into the car. She then drove, at the assailant's direction, to the countryside near Bloomington-Normal. She described the weather as a heavy snow. Other witnesses described the weather on the night in question as a blizzard. Driving conditions were most difficult. In addition to giving directions as she drove, the assailant repeatedly told the victim, who had begun to cry, that she was making him nervous.

After driving for approximately 10 to 15 minutes, the complaining witness was ordered to turn onto a service road leading to a power company substation. As soon as the car was parked, she was told to remove her clothes, and upon her refusal to do so, the assailant began to rip her clothing and to choke her. The attacker then pulled down his trousers and told her to perform fellatio upon him. When she refused to do so, he forced her to submit to an act of sexual intercourse.

Following this attack, the assailant asked the complaining witness if she had any money and she switched on the domelight in her car in order to locate her wallet. After finding $10 in her wallet, she handed this amount to the rapist and she later testified that she was able to discern his facial characteristics as well as see his face directly for about one minute.

Shortly after the attack, Harvey Bledsoe knocked on a window of the complaining witness' car and explained that his car had stalled roughly 100 to 200 yards north of the service road, and, unaware of the rape, he requested a ride to town. The complaining witness indicated that Bledsoe should get into the car in spite of her attacker's opposition. Bledsoe testified that he returned with them to Bloomington. However he was unable to identify the assailant since he was seated behind the rapist. Upon reaching the parking lot of the complaining witness' apartment building, the assailant left the car and ran away.

After the attacker had left the car, the complaining witness started crying and revealed to Bledsoe that she had been raped. Bledsoe helped her walk to her apartment and once there they called the police. According to Bledsoe's testimony, he estimated that the time they reached her apartment was before midnight. However, other testimony, and in particular the police log of complaining witness' call, indicated that the call was received at approximately 12:22 a.m. The complaining witness

was thereafter taken to a hospital where an examination revealed that she had been raped.

In assisting the police officers with the investigation, the victim viewed more than 2,000 photographs and viewed a lineup that was conducted on February 1, 1978. She was unable, however, to identify any of the individuals as the defendant. At a lineup conducted on February 14, 1978, the victim picked the defendant as her assailant. This lineup consisted of five males wearing dark clothing and dark stocking caps. When the victim viewed the five subjects, she indicated that the defendant was the offender but her initial identification was not positive. Following the lineup, each of the individuals in the lineup was requested to utter the phrase, "You're making me nervous," from behind the door of the viewing room. After doing so, the complaining witness identified the defendant's voice as that of the rapist. She declined, however, to make a positive identification of the defendant at the time of the lineup. She returned to the police station two days later to positively identify the defendant from a photograph taken of the lineup. Her reason for the delay in identifying the defendant was that she wanted to make sure in her own mind that the defendant was the attacker, and she wanted to make sure she could go through with the trial if she identified him.

Testimony for the defense revealed that the defendant was a resident of Clinton, Illinois; that he was 20 years of age; and that he lived with his parents and sister. The defendant testified that he started working as a security guard at State Farm Insurance Company in Bloomington on January 4, 1978, and that his hours of employment for the 25th of January 1978 were from 4 p.m. to 12 midnight. He noted that he drove back and forth to Clinton after work except for those occasions when the weather made driving hazardous. On those occasions, he would stay with his sister who lived in Normal, and he noted that he had stayed there approximately eight or nine times since he began to work at State Farm.

The defendant testified that he went to work at 4 p.m. on January 25, 1978, and worked his normal shift to 12 midnight. He noted that the weather that night was quite bad and that he didn't attempt to drive to Clinton after work. He testified that he left work at approximately 12 midnight and drove directly to his sister's home arriving there at approximately 12:20 a.m. As he entered his sister's home, he noted that she was talking on the telephone and discovered that she was calling their mother in Clinton to inform his parents that he was spending the night in Normal. The defendant's sister testified later in the trial and corroborated the fact that she had called her parents that night by producing a telephone bill which indicated the date of the call and the time it was made.

The defendant noted that while working at State Farm he was

required to wear a uniform at all times and he described his uniform as a dark shirt with whistle chain, light blue pants with a black stripe down the side, a light blue hat, and a dark jacket. The defendant testified that he wore this uniform on the night in question and was wearing it when he arrived at his sister's home after work. In addition, the defendant testified that he wore an insulated jump suit over his uniform as well as large black mittens which extended up to his elbows.

The security sergeant for State Farm testified that on January 25, 1978, the defendant had made an interior building patrol from 10:52 p.m. until 11:20 p.m., and that his patrol was documented by a clock tape from a watchman's patrol clock that the defendant had carried. The sergeant testified that his security log revealed that the defendant was assigned to an exterior patrol from 11:35 p.m. to 11:50 p.m., on January 25, 1978. According to the security sergeant, this was the last actual duty for the defendant on January 25, 1978. The sergeant described the exterior patrol as walking around the outside of the building checking for unauthorized persons in the area or for damaged areas. The sergeant noted that upon completing the exterior patrol at that time of the evening, a security officer would be allowed to get his personal items and then would come to the security desk and tell the sergeant he was finished. Other than completing the security log, the sergeant had no recollection whether the defendant completed the exterior patrol as he was required to do on the evening of January 25, 1978.

The defendant contends that the victim's identification testimony was not sufficiently reliable. In addition, the defendant argues that employment records establish that he was working when the crimes for which he was charged occurred.

■■■ It is well established in rape cases that reviewing courts are charged with carefully examining the evidence, and where that evidence does not remove all reasonable doubt and create an abiding conviction that the defendant is guilty of the crimes charged, his conviction must be reversed. (*People v. Anderson* (1974), 20 Ill. App. 3d 840, 314 N.E.2d 651.) Although the testimony of the complaining witness alone is sufficient to support a conviction for rape, that testimony must be found to be clear and convincing. (*People v. Reaves* (1962), 24 Ill. 2d 380, 183 N.E.2d 169; *People v. Clemons* (1976), 44 Ill. App. 3d 26, 358 N.E.2d 20.) Moreover, uncertain identification testimony is not sufficient to convict where there is uncontradicted alibi testimony. *People v. Jefferson* (1962), 24 Ill. 2d 398, 182 N.E.2d 1.

■■ As noted previously, the complaining witness declined to make a positive identification of the defendant at the time of the lineup. However, she returned to the police station two days later and identified the defendant from a photograph taken of the lineup. Her reason for the

delay was that she wanted to make sure that the defendant was the attacker and that she could withstand the pressures of a trial. The delay in identifying the attacker certainly indicates uncertainty on the part of the complaining witness. That fact, coupled with the essentially uncontradicted alibi testimony presented by defense witnesses clearly indicates that the evidence to convict was not clear and convincing.

Further, the weather conditions as detailed; the short time restraints; the travel conditions as described; plus the fact that defendant was accounted for at his employment and at his sister's apartment leads to the reasonable doubt that he could have traversed the routes within the time restraints, changed clothes as would be required, and yet be accounted for at times specifically pinpointed by his watchman's punch clock and his sister's telephone bill. In fact, the evidence presented does not remove all reasonable doubt and does not create an abiding conviction that the defendant is guilty of the crimes charged. (*Anderson.*) Consequently, we are of the opinion that the evidence is not sufficient to establish defendant's guilt beyond a reasonable doubt and thus his convictions must be reversed. Other alleged errors need not be considered.

Reversed.

GREEN, J., concurs.

Mr. JUSTICE TRAPP, dissenting:
Identification was made by the complaining witness in a dual aspect, in the sense that her visual observations were confirmed by the recognition of defendant's voice. The record shows ample opportunity to observe the defendant in each aspect.

The record suggests that the complaining witness exercised care and caution in completing her identification of the defendant. We need not conclude that such record demonstrates uncertainty in the identification. The jurors who observed the witness can better conclude whether the identification was clear and convincing than we can from the written record.

Apart from the "log" of an assignment at 11:35 p.m., there is no evidence supporting an alibi until the testimony of the defendant's sister concerning his arrival at her home. Again, the jurors are better able to judge the credibility of the defendant than we are.

I would affirm the judgment as the determination of the issues of fact by the jury.