THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JERRY PALMER, Defendant-Appellant.

Fourth District   No. 4—83—0706

Opinion filed July 12, 1984.

Daniel D. Yuhas and John J. Hanlon, both of State Appellate Defender's Office, of Springfield, for appellant.

Ronald C. Dozier, State's Attorney, of Bloomington (Robert J. Biderman and Linda Welge, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE TRAPP delivered the opinion of the court:

Following a jury trial, defendant Jerry Palmer was convicted of rape and sentenced to 20 years' imprisonment. He appeals, contending the State failed to establish his guilt beyond a reasonable doubt. He also asserts he was denied a fair trial because the jury considered extraneous, prejudicial information and the judge coerced the guilty

verdict from the jury.

A 12-year-old papergirl was raped early in the morning on September 23, 1982. At about 6 a.m., she left her Bloomington home to do her paper route, which took about a half hour to complete. When she reached the corner of Market and Hinshaw Streets, she noticed a black man across the street. He walked away, but she saw him again a few minutes later at the corner of Holton Drive and Hinshaw. After she delivered a paper to the house on the corner of Sheridan and Hinshaw, the man approached her. He asked if he could buy a paper, and she sold him one. She then continued on her route. Halfway through her route, the man stopped her again and asked her to go with him to get some bicycles. She refused, stating she had to finish her route. The man pulled out a knife and put it to her neck. The knife had a short dull blade and a brown handle. He took her to a secluded area and raped her. After about five minutes, the man got up and handed the victim her radio, then he left stating, "he had to go to pick up the kids over at the school bus." She got up and walked about two blocks to her home.

The girl arrived home very upset, according to her mother. After talking with the victim for a few minutes, the mother determined what had happened. She then ran one block to the nearest telephone and called the police. The police received the call at 6:33 a.m.

At trial, the victim described the rapist as a thin, black man with short hair and a mustache. He wore a short, brown leather jacket and gray pants. She stated that he was a lot taller than she. She was about five feet tall when the rape occurred. She was also cross-eyed, but she wore corrective glasses. Her glasses were knocked off during the rape, but she stated she could see "pretty good" without them. The victim identified defendant as the rapist.

On cross-examination, the victim admitted she had described the rapist to police as 5 feet 9 inches, 150 pounds, and in his late teens or early twenties. She testified she did not remember the rapist's skin tone when giving her original description. Defendant is 6 feet 5 inches, 210 to 225 pounds, and he has a medium build and dark skin tone. He was 27 years old at the time of the rape. The victim, who was about 5 feet tall, testified she did not know her own height or weight or the height of any of her family members except her father.

The victim testified her paper route took her through Holton Homes, defendant's neighborhood. She also visited a bait shop near her home to buy candy and get change. A picture of defendant holding a catfish hung on one of the doors to the store prior to the attack. Defendant also visited the store frequently.

Officer Steve Reeter responded to the mother's call. He testified the victim was upset and stammering when he arrived at her home. Reeter attempted to get a description, but he could not get anything definite from her. He testified he supplied the 5-foot 9-inch figure based upon her statement that the rapist was taller than he. Reeter is 5 feet 6 inches. The victim also told him the rapist was thin, and Reeter estimated the rapist's weight to be 150 pounds based upon experience and training. Reeter took her to the hospital for a medical examination, and then he took her to the police station.

At the hospital, doctors removed seminal material from the victim and a hair from her clothing. Testing showed the hair was not consistent with defendant's hair, but it was not matched against the victim's hair. Defendant was a possible donor of the semen, but only 17% of the black population was excluded.

The victim's 13-year-old sister was also a papergirl. She testified that a black man accompanied her on her route on nine mornings between September 6 and September 18. On one occasion, he asked if he could buy a paper from her. On September 15, he tried to kiss her. When she finished her route on September 18, he pushed her onto an old truck bed. She screamed, and he let her go. He told her that he would get her the next day.

On September 23, the victim's sister saw the man a little before 6 a.m. Although it was not very light out, she knew it was the same man. She ran to a nearby house, and the occupant, Helen Houchin, heard her knock at the door. She let the girl into her house and called the police. The police received the call at 6 a.m.

At the police station that morning, the sister described the man as black, 6 feet tall or under, 22 years old, 160 to 190 pounds with a thin mustache, a beard, and short, curly "perm" type hair. Defendant had short, nonpermed hair, and he did not wear a beard at the time of the rape. The victim's sister also told police she thought he said his name was Larry. At trial, she identified defendant as the man she had seen on all the previous occasions. She was 5 feet 1 inch tall and 80 to 90 pounds at the time of the incident.

When the victim arrived at the police station, the two girls were placed in separate rooms. Each girl was shown two sets of six pictures and neither sister recognized any of them. They were then shown 26 more pictures. Both girls picked out defendant's photograph.

After this photo identification, police went to defendant's home. Defendant's wife, Joyce Palmer, told them defendant was at work, and she denied them permission to search the house. Police stayed to

search anyone who left the house. Mrs. Palmer eventually gave permission for the search. Police did not find the clothes or knife that the victim had described.

Defendant was arrested that afternoon at his place of work in Covell. He was wearing camouflage pants, a blue or gray jacket, and army boots. He denied any knowledge of the rape and stated he had been wearing the same clothes all day. He told police he had arisen at 5:30 a.m., fed his baby, showered, hit a few golf balls in his yard, and then went directly to work.

Several alibi witnesses testified for defendant. Mrs. Palmer testified she and defendant went to bed at 2 a.m., on September 23. Her son, Cory Gibson, knocked on their bedroom door to wake them early in the morning. Their baby's crib, which had been leaning against the door to keep it shut, was still in that position. Defendant arose and went downstairs to fix the baby's bottle. Mrs. Palmer testified she did not know what time they got up, although she had earlier told police it was at 6 a.m. Defendant returned upstairs to shave and shower, which took 15 minutes. He dressed in the clothes that he wore when he was arrested later that day. He took his golf clubs and went outside for three or four minutes. He then left for work with his employer, Alva Brent. Mrs. Palmer testified she did not know what time defendant left; however, she had told police he left around 7:05 a.m. She testified Cory left for school about 15 minutes after defendant had departed.

Cory Gibson, defendant's 12-year-old stepson, testified he woke his parents up September 23. He did not know the time, although he had told police it was at 5:45 a.m. He also testified defendant was outside hitting golf balls for just a few minutes before leaving for work. Cory remembered seeing defendant wearing the camouflage pants. Cory testified he left for school about 15 minutes after defendant left. He wanted to attend free swim, which began at "7:00 something." The walk to school took 15 to 20 minutes, and he arrived at school a little later than when open swim began, at a few minutes after 7.

Defendant's employer, Alva Brent, testified he drove defendant to work every day. Brent testified he left his home at 6:12 a.m., on September 23, and he arrived at defendant's home between 6:25 and 6:30. He saw defendant in the yard with a golf club. They then left for work. Brent had earlier told police he arrived at defendant's house at 6:45 or 6:50 that morning.

Shirley McGill, defendant's neighbor, saw Brent's truck arrive at defendant's home at 6:30 or 6:35 that morning as she was leaving for

work. She stated it was a 10-minute drive to work and another 10 minutes before she checked in. She checked in that morning at 6:56 a.m.

Sam Reed also testified for defendant. Reed rented a house about 40 yards from where the rape occurred. Reed testified he was changing the oil and rotating the tires on his car on September 23. At about 6:30 a.m., he saw a black man and the papergirl go into the area where the rape occurred. After 5 to 10 minutes, the girl came out and walked away. The man emerged and walked within 10 feet of Reed. Reed described the man as thin, petite, 5 feet 9 inches, with a beard and jerry curled hair. The man wore a waist-length leather coat and light pants. Reed knew the man's name was Andy and he drove a 1973 red Camero. Reed stated the man was not defendant. Reed did not contact the police with this information. Reed also admitted he knew defendant previously and had given him rides to work. The State introduced Reed's two prior convictions to attack his credibility.

The jury began deliberating at 4:15 p.m. on July 22, 1983, and continued until after 11 p.m. Deliberations resumed the next day at 9:30 a.m. At 10:25, the jury sent a note to the judge, which stated:

"Judge: We have taken 6 votes, and have shown a change of only two from an even vote. In good conscience after much discussion we do not see the possibility of a unanimous verdict in this case. What are our instructions at this point."

Upon hearing of the jury's note, defendant moved for a mistrial. The judge wrote to the jury "continue your deliberations." Defendant again moved for a mistrial. The court decided to recall the jury and declare a mistrial if there had been no change in the voting. Around noon, the court questioned the foreman, who responded that the jury had started on another line of thinking and wanted to continue. At 3:30 p.m., the jury returned the guilty verdict.

Defendant's supplemental post-trial motion included an affidavit by juror Joseph Barth. According to the affidavit, another juror stated during deliberations that she had a child who attended the same school as Cory Gibson. The juror had dropped her child off for open swim at 7:30, possibly on more than one occasion in the past. Defendant argued this constituted an improper, independent investigation by a juror, and thus, deprived him of a fair trial. The trial court rejected this argument.

■ Defendant first asserts a reasonable doubt as to his guilt remains. In rape cases, reviewing courts must carefully examine all the evidence, and if the evidence fails to remove all reasonable doubt and create an abiding conviction that defendant is guilty, then the court

must reverse the jury's finding. (*People v. Raker* (1979), 75 Ill. App. 3d 975, 978, 394 N.E.2d 852, 854.) Although reviewing courts have this special duty in rape cases, they may not encroach upon the jury's function to weigh credibility and otherwise assess the evidence. Thus, conflicting evidence alone will not justify a reversal of a conviction. Rather, a reviewing court will set aside a guilty finding only if the evidence is so palpably contrary to the finding or so unreasonable, improbable, or unsatisfactory as to leave a reasonable doubt about the accused's guilt. *People v. Reese* (1973), 54 Ill. 2d 51, 57-58, 294 N.E.2d 288, 291.

■ ■ Defendant contends the victim's identification is insufficient proof of his guilt. A conviction cannot be based upon vague, doubtful, or uncertain identification testimony. (*People v. Brown* (1972), 52 Ill. 2d 94, 285 N.E.2d 1.) The sufficiency of identification testimony, however, is a fact question for the jury, and the testimony of a single identification witness is sufficient to support a conviction if the witness viewed the accused under circumstances permitting a positive identification to be made. (*People v. Strater* (1979), 72 Ill. App. 3d 486, 490, 390 N.E.2d 979, 982.) The victim had ample opportunity to view the rapist. She saw him four times that morning, including during the actual rape when he had lain face-to-face upon her for five minutes.

■ ■ Defendant argues the discrepancies between the victim's initial description to police and his actual appearance make her testimony vague, doubtful, and uncertain. Defendant fails to recognize the difference between the validity of a witness' identification and the witness' credibility. Evidence showing either the identification was made under overly suggestive circumstances or the witness had an inadequate opportunity to view the accused destroys the validity of an identification. (*People v. Brown* (1972), 52 Ill. 2d 94, 285 N.E.2d 1; *People v. Cullotta* (1965), 32 Ill. 2d 502, 207 N.E.2d 444.) This makes the identification vague, doubtful, or uncertain. Discrepancies or omissions of detail, however, do not destroy the validity of an identification; rather, they go to the weight of the testimony and are evaluated by the trier of fact. *People v. Bibbs* (1981), 101 Ill. App. 3d 892, 897, 428 N.E.2d 965, 969.

Because a charge of rape is easy to make and hard to defend, the law requires the victim's testimony to be either clear and convincing or corroborated. (*People v. Reaves* (1962), 24 Ill. 2d 380, 382, 183 N.E.2d 169, 170.) For example, when the victim first denies the rape occurred or delays identifying the accused, then her testimony cannot be clear and convincing, and it must be corroborated. (*People v. White*

(1962), 26 Ill. 2d 199, 186 N.E.2d 351; *People v. Raker* (1979), 75 Ill. App. 3d 975, 394 N.E.2d 852.) Defendant concludes the victim's testimony is not clear and convincing because her initial description of him was inaccurate.

Precise accuracy in a defendant's description, however, is not required when the identification is positive. (*People v. Brown* (1977), 50 Ill. App. 3d 348, 353, 365 N.E.2d 907, 910; *People v. Coe* (1978), 67 Ill. App. 3d 552, 384 N.E.2d 987.) Clear and convincing evidence is not synonymous with uncontradicted or unimpeached testimony. If the victim's story is consistent and any discrepancies do not detract from its reasonableness, her testimony can be clear and convincing. (*People v. Thompson* (1978), 57 Ill. App. 3d 134, 140, 372 N.E.2d 1052, 1057-58.) The important factor is the witness' ability to make a positive identification after having an adequate opportunity to view the offender. *People v. Nichols* (1975), 32 Ill. App. 3d 265, 268, 336 N.E.2d 194, 196.

■ The victim's testimony was both consistent and reasonable. She positively identified defendant at trial and in the photo lineup. Her testimony was not unreasonable merely because she was a bad judge of height, weight, and age. Due to the large differences between their sizes, the victim could not easily compare the rapist's height or weight to her own. In fact, she did not even know her own height or weight. The police officer testified he supplied the height and weight figures based upon the victim's general statements. The fact that she could not accurately describe defendant's height, weight, or age is not surprising. As the court stated in *People v. Evans* (1962), 25 Ill. 2d 194, 201, 184 N.E.2d 836, 839-40:

"It is a matter of knowledge that these matters are often deceiving, that few people are accurate judges of height and weight, and that many people are notoriously poor judges."

The same can be said of age.

The jury was fully aware of the discrepancies between the victim's initial description and defendant's actual appearance. The court in *Evans* also noted:

"The jury, who not only heard the testimony but saw the defendant in court, was in a far better position than are we to evaluate the weight to be given to the discrepancy in the description insofar as it pertained to defendant's height and weight, and we are unable to say that the jury was required to regard the discrepancy as sufficient to create a reasonable doubt as to defendant's guilt." (25 Ill. 2d 194, 201, 184 N.E.2d 836, 840.)

We will not second-guess the jury's determination on a matter of credibility.

Moreover, the victim's identification was corroborated by her sister's testimony. Her sister also had ample opportunity to view the man. Both girls separately selected defendant's photograph as that of the attacker. Both girls positively identified defendant at trial. Defendant asserts the sister's testimony is insufficient corroboration because she also inaccurately described defendant. Once again, the jury heard all the evidence and decided on the girls' credibility.

Defendant speculates the girls recognized him from his picture in the bait shop and from seeing him in the neighborhood. The victim's sister, however, testified she had never seen defendant before September 6 when he accompanied her on her paper route. Furthermore, neither girl picked defendant's photograph as someone with whom they were familiar. When the victim saw defendant's photograph, she stated: "This is him." Her sister saw defendant's photograph and stated: "This is him. I could never forget a face like that."

■ Defendant further contends that the alibi witnesses and Reed's testimony raise a reasonable doubt about his guilt. We note the testimony of both defendant's wife and employer varied from the statements they made to police. Furthermore, the jury is never required to accept alibi testimony over the positive identification of the accused even if the alibi testimony is given by a greater number of witnesses. The jury is in a superior position to observe the witnesses and consider their interest in exonerating defendant. (*People v. Jackson* (1973), 54 Ill. 2d 143, 149, 295 N.E.2d 462, 464.) Nor did the jury have to believe Reed's testimony. Reed knew defendant prior to the rape. He never went to police with his information, but instead, he went to defendant's wife. Finally, the victim testified she saw no one where Reed claimed to be on the day of the rape.

■ Secondly, defendant argues he was denied a fair trial because the jury considered extraneous, prejudicial information. Defendant contends the juror's statement regarding the time she dropped her child off for open swim contradicted his stepson's testimony. Defendant used the testimony of his wife and stepson to establish the time he left for work. Defendant concludes the juror's statement effectively destroyed the credibility of these two alibi witnesses.

While evidence that the jury considered extraneous information can be used to impeach the verdict, not every instance in which unauthorized information reaches the jury results in reversible error. (*People v. Holmes* (1978), 69 Ill. 2d 507, 517, 372 N.E.2d 656, 661.) Only when defendant is prejudiced is reversal required. *People v. Hayes*

(1979), 70 Ill. App. 3d 811, 828, 388 N.E.2d 817, 829.

Defendant contends the extraneous information was crucial because it dealt with the time of the day's events. The State maintains the information was irrelevant and defendant was not prejudiced. The State first points out the juror's statement does not indicate when open swim began on the day in question. The State also asserts the real issue is when the stepson left for school, not when open swim began. Defendant used the time his stepson left for school as a reference point for estimating the time he departed for work.

■■ The information was neither crucial nor explicit enough to determine that defendant was prejudiced. (*People v. Hayes* (1979), 70 Ill. App. 3d 811, 828, 388 N.E.2d 817, 829.) It did not relate directly to guilt. (*People v. Wurster* (1980), 83 Ill. App. 3d 399, 410, 403 N.E.2d 1306, 1315.) Moreover, the stepson's testimony regarding the time defendant left for work was cumulative. Both defendant's employer and neighbor testified as to the time defendant went to work. Additionally, both the wife and stepson testified defendant left the house for only a few minutes before going directly to work. When open swim actually began, therefore, was unimportant.

■■ Finally, defendant contends the trial judge coerced the verdict when he instructed the jury to "continue your deliberation." The State argues defendant waived the issue by failing to clearly raise it at trial or in his post-trial motion. The plain error doctrine, however, may be invoked in criminal cases where the evidence is closely balanced or where the error is of such magnitude that defendant was denied a fair trial. (87 Ill. 2d R. 615(a); *People v. Lucas* (1981), 88 Ill. 2d 245, 251, 430 N.E.2d 1091, 1094.) The right to a fair trial by an impartial jury is so basic that a violation requires reversal. (*People v. Cole* (1973), 54 Ill. 2d 401, 411, 298 N.E.2d 705, 711.) In addition, the length of the jury deliberations and the jury's note demonstrate the closely balanced nature of the evidence in this case. Defendant's failure to raise the issue in the trial court, therefore, is irrelevant.

Defendant maintains the trial court erred in failing to declare a mistrial or give a *Prim* instruction. (*People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601.) Generally, the length of jury deliberations is left to the sound discretion of the trial court (*People v. Daily* (1968), 41 Ill. 2d 116, 242 N.E.2d 170), as is the decision of whether to declare a mistrial (*People v. Watson* (1982), 103 Ill. App. 3d 992, 999, 431 N.E.2d 1350, 1356). Mere failure to give a *Prim* instruction to a deadlocked jury is not reversible error. The directive in *Prim* was aimed mainly at eliminating instructions to heed the majority. (*People v. Preston* (1979), 76 Ill. 2d 274, 391 N.E.2d 359.) We also note defend-

ant never requested the trial court to give a *Prim* instruction.

The court's instruction to "continue your deliberations" did not coerce the verdict. The test is whether under the circumstances the language actually used hastened the verdict or coerced or interfered with the jury's deliberations to the prejudice of defendant. (*People v. Pankey* (1978), 58 Ill. App. 3d 924, 927, 374 N.E.2d 1114, 1116.) The jury heard conflicting testimony from 21 witnesses over three days. (See *People v. Daily* (1968), 41 Ill. 2d 116, 121, 242 N.E.2d 170, 173.) When questioned, the foreman stated the jury wanted to continue deliberating because they had started on another line of thinking. The jury did not reach its verdict until almost five hours after the judge's instruction. (See *People v. Evans* (1979), 80 Ill. App. 3d 444, 460, 399 N.E.2d 1333, 1345.) Finally, the language actually used was simple, neutral, and in no way coercive. *People v. Farella* (1979), 79 Ill. App. 3d 440, 446, 398 N.E.2d 615, 617.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

GREEN and MILLER, JJ., concur.