THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARK STENGEL, Defendant-Appellant.

First District (5th Division)   No. 1—89—1900

Opinion filed March 8, 1991.—Rehearing denied April 5, 1991.

Michael D. Monico and Barry A. Spevack, both of Monico, Pavich & Spevack, and Marvin Bloom, both of Chicago, for appellant.

John M. O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Joseph Brent, and Mary Brigid Kenney, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MURRAY delivered the opinion of the court:

After a bench trial, defendant, Mark Stengel (Stengel), was convicted of criminal sexual assault. (Ill. Rev. Stat. 1985, ch. 38, par. 12—13(a)(1).) The trial court found that Stengel committed an act of sexual penetration upon C.B. between Stengel's penis and C.B.'s vagina by use of force and threat of force in violation of section 12—13(a)(1) of the Criminal Code of 1961, as amended (Ill. Rev. Stat. 1985, ch. 38, par. 12—13(a)(1)). Defendant was sentenced to serve four years in the Illinois Department of Corrections. Defendant appeals the judgment of conviction.

The crime at issue is commonly referred to in dictionaries, legal textbooks, statutes, novels and even poems as rape. The fact that Stengel's penis penetrated C.B.'s vagina is not at issue. Stengel claims the penetration was consensual. The State and C.B. claim it was not.

Stengel raises the following issues for review: (1) whether the defendant was proven guilty beyond a reasonable doubt; (2) whether the trial court unduly restricted defendant's cross-examination of C.B. denying him a fair trial; and (3) whether the trial judge should have recused himself.

The facts as to how Stengel and C.B. met appear undisputed. C.B. worked as a cocktail waitress at a restaurant/bar in Des Plaines, Illinois. In late November 1986, Stengel, a 25-year-old vice-president of a tool company, met C.B. in the bar where she worked. C.B. waited on Stengel and his friend, Dr. Apollo Solecki.

Stengel returned to the bar on several occasions alone. Each time he sat in C.B.'s station and engaged in small talk with her. The first several times Stengel had a drink at the bar he paid for the drinks with cash. However, the third time he returned to the bar Stengel used a credit card to pay his bill. The credit card included the initials "M.D." following Stengel's name, creating the false impression that he was a doctor. On at least one occasion Stengel left a $10 tip for one drink.

Eventually C.B. and Stengel agreed to meet for lunch on December 5, 1986. Stengel gave C.B. his phone number and in turn C.B. wrote out her phone number and directions to her apartment on a napkin.

Many of the remaining facts are disputed.

At trial Stengel testified on his own behalf. Stengel testified that on December 5, 1986, he drove to C.B.'s apartment. Stengel believed he arrived at C.B.'s apartment around noon. He brought a bottle of champagne with him as a present. C.B. invited him into her apartment. C.B. rinsed off some glasses for the champagne and they toasted one another. The two talked in the living room for about an hour. According to Stengel, it was during this conversation that C.B. first revealed that she did not have a driver's license as a result of a drunk driving conviction.

Stengel drove C.B. to the Fountain Blue restaurant. Stengel took the partially finished champagne bottle with him so that C.B.'s boyfriend would not discover it. Along the way to the restaurant, while waiting at a red light to make a left turn, Stengel placed the champagne bottle, which he had been balancing on his lap, on a median strip near Golf Road and Oakton Community College.

During the drive, Stengel made two calls on his cellular phone. The second call was to Dr. Solecki. Stengel purposely left on the speaker for the inception of the conversation so that C.B. might hear Dr. Solecki's habit of addressing Stengel as "doctor."

Once at the restaurant, Stengel ordered two glasses of wine. He believes they both finished their entire glass of wine. Throughout lunch the two engaged in conversation, Stengel stating, falsely, that he worked at St. Mary's and St. Francis hospitals and C.B. deprecating her boyfriend as a "hamburger flipper" at a fast-food restaurant who

was going nowhere. Stengel ordered two pieces of cheesecake to go for dessert.

When they left the restaurant Stengel drove to a place called Wally's. They arrived at Wally's about 2:30 p.m. Stengel introduced C.B. to Pete Buhelos, the owner of Wally's. Stengel jokingly said to Pete that he would one day marry C.B.

Once back at C.B.'s apartment, C.B. willingly invited Stengel in. Stengel and C.B. sat down on the couch and talked. C.B. eventually produced some cocaine, which they shared. C.B. and Stengel began fondling, petting and grabbing at one another. These acts culminated in sexual intercourse. Stengel maintains that the sexual intercourse was totally consensual.

After sexual intercourse, Stengel and C.B. talked in bed. Stengel commented about a Tom Cruise poster hanging in the bedroom. C.B. responded that the Hustler magazines sitting on the living room table were her boyfriend's way of getting even with her for the poster hanging in the bedroom. C.B. inquired as to a follow-up date. Stengel kept putting her off. Finally, Stengel disclosed that he had a serious girlfriend and he was not a doctor.

C.B.'s version of the events of December 5, 1986, is very different from Stengel's. C.B. testified that during a conversation at the bar she worked at she told Stengel that her driver's license had been revoked for drunk driving. Stengel responded by saying that his brother was an attorney and could help her regain her license. Stengel offered to discuss, over lunch, the possibility of his brother helping C.B. C.B. did not have money to pay an attorney and thought Stengel was doing a favor for her.

C.B. wrote her phone number and address on a napkin and gave it to Stengel. At the time C.B. was living with her boyfriend, Jeff. C.B. did not tell Jeff that she planned to meet Stengel that day. C.B. considered the lunch a business luncheon. She did not consider the lunch to be a romantic or social date. C.B. testified that Stengel knew she had a boyfriend. She had pointed her boyfriend out to Stengel one night when he had come into the bar she worked at.

Stengel arrived at C.B.'s apartment approximately 20 minutes late. The two visited in the living room of C.B.'s apartment for 5 to 10 minutes. C.B. denies that Stengel had brought a bottle of champagne. C.B. and Stengel left the apartment and drove to the Fountain Blue restaurant for lunch. Stengel made two phone calls on his cellular phone while en route to the restaurant. One call was to Dr. Solecki.

Once at the restaurant Stengel ordered two glasses of wine. Stengel drank his glass of wine, while C.B. only had a few sips of hers.

Stengel told C.B. that his brother was a well-known attorney, his brother could definitely help her, and that defendant would definitely discuss the matter with his brother. C.B. never got the brother's name. She alleges she is bad with names and never would have remembered it anyway. At trial C.B. stated "It was more like he was a friend, and he was doing me a favor, and I didn't doubt him at that point."

When they left the restaurant C.B. told Stengel that she started work at 4 p.m. After Stengel and C.B. left the restaurant, Stengel drove to a hot dog stand so that he could introduce C.B. to the owner, Pete. Stengel introduced C.B. and made a comment about C.B. being a "sweetie." Stengel didn't touch C.B. and C.B. didn't touch Stengel. Stengel and C.B. left Wally's to return to C.B.'s apartment. During the ride home Stengel told C.B. to move over from the passenger seat and sit next to him. C.B. claims that Stengel grew irritated when she refused to move over. C.B. did not want Stengel to come upstairs; however, after Stengel's insistence that he needed to use the bathroom she agreed to let him in.

Once inside Stengel emerged from the bathroom and grabbed C.B. C.B. started to scream when he grabbed her. C.B. told Stengel to let her go and leave. Stengel threw C.B. on the bed and pinned her with his body. C.B. was 5 feet 4 inches tall and weighed 105 pounds. Stengel was 6 feet 1 inch tall and weighed 190 pounds. C.B. struggled unsuccessfully to get away. Stengel ripped down C.B.'s nylons, leaving the nylons on one leg. In one motion Stengel pulled down C.B.'s elastic-waisted skirt and elastic-waisted slip. Stengel unzipped his pants. He inserted his penis in C.B.'s vagina for approximately 30 seconds.

During the struggle C.B. received two superficial scratches on her face and a swollen lip. C.B. felt Stengel's watch against her face. Stengel bit her lip trying to insert his tongue in her mouth. When Stengel released C.B. she jumped off the bed. She still had on her sweater, bra and one shoe. She tried to cover the rest of her body with her skirt. Stengel apologized and said he did not mean it. He asked for a hug and C.B. obeyed. He told her to take a shower and apologized again. Stengel left C.B.'s apartment.

At this time C.B.'s underwear and nylons were on the floor. C.B. was in shock. She went into the bathroom and wiped her vagina with a Kleenex. When asked if she remembered touching herself with anything else, C.B. responded, "Maybe my underwear, I'm not sure."

C.B. was crying. She looked out the window to make sure Stengel left. She saw him go out of the apartment building and watched him get in his car and pick up the phone. The phone rang but she did not answer it. Not knowing what to do, C.B. took a shower. She didn't

really wash herself, but rather stood in the shower crying. When she got out of the shower she called her boyfriend, Jeff. A few moments later Stengel called and apologized.

Jeff came home and asked what had happened. C.B. explained who she had been out with. She had told Jeff that morning that she was trying to do something about her DUI but it was to be a surprise for him.

C.B. gave Jeff Stengel's number. Jeff tried to call him. Jeff then made a number of calls, several to directory assistance and a call to try and find out if Stengel was a doctor. Jeff then called the police. The call to the police was placed approximately 10 minutes after Jeff came into the apartment.

C.B.'s boyfriend, Jeff, testified on C.B.'s behalf. He testified that in December of 1986 he was living with C.B. On December 5, 1986, while he was at work, he received a phone call from C.B. at approximately 3 p.m. C.B. was crying and having trouble talking. She asked him to come home right away. A few minutes later Jeff left work and drove home.

When he first walked in the apartment C.B. was in a towel, her hair still wet from a shower and she was shaking. She had scratches on her face and wrists, bruises under her eyes, and a bruise on her lip. C.B. was hysterical. Jeff asked C.B. what had happened and she mumbled, rape. C.B. told Jeff that she got a bruise under her eye when Stengel was holding her down. C.B. said that she tried to escape but Stengel kept putting her back and Stengel's cuffs kept hitting her face.

C.B. told Jeff bits and pieces of what had happened. Jeff told her that they should probably call the police. C.B. refused. She didn't want anyone to know. Jeff told C.B. she should call her parents. She still did not want anyone to know. C.B. then told him that if they were going to tell anybody, that they should tell the police.

C.B. had told Jeff that the guy was a doctor, and Jeff figured that he wanted to talk to him. Jeff called directory assistance and then the hospital. The hospital had no doctor by the name of Mark Stengel. Jeff made these calls before he called the police.

Jeff testified that in December 1986 C.B. was earning more money than he was. To this day C.B. earns more than Jeff. Jeff recalled C.B. mentioning Stengel's name several days prior to the incident. He also recalled that a few days before the incident, C.B. mentioned that a doctor had given her a $10 dollar tip.

C.B. told Jeff that Stengel had given her a note with his phone number and name on it. C.B. did not tell Jeff that she had a date with

Stengel. However, the morning of December 5, 1986, she told Jeff that she was doing something about her DUI and that this was a surprise for him.

In response to a question as to whether he had any Hustler magazines Jeff answered, "Yes, maybe one." Jeff stated that C.B. had a Tom Cruise poster in their bedroom. Jeff testified that he did not have drugs in the house on December 5, 1986.

Stengel's girlfriend, Monica, testified that after the preliminary hearing on January 16, 1987, she drove with Stengel to the area of Golf Road and Oakton Community College and recovered a dirty champagne bottle lying in the median in the snow.

The parties stipulated to the testimony of Lisa Haley, a laboratory scientist at Northern Illinois Police Crime Laboratory. Ms. Haley had occasion to examine two pieces of Kleenexes. She examined both of them microscopically, and in her opinion, she observed the presence of spermatozoa cells on the Kleenexes. Ms. Haley had occasion to examine pantyhose and a shoe. Her test revealed the presence of sperm on the pantyhose. Ms. Haley had occasion to examine a pair of pink panties. She cut holes in the panties and conducted a microscopic analysis of the holes. In Ms. Haley's opinion she observed spermatozoa cells on those samples.

Although lab reports were taken and other demonstrative evidence secured, the only real evidence of a forceful or consensual penetration was the respective testimony of Stengel and C.B.

For the following reasons, we must affirm the decision of the trial court.

Stengel's primary claim on appeal is that he was not proven guilty of the crime for which he was convicted beyond a reasonable doubt. The claim is based on the contention that C.B.'s testimony concerning her lack of consent was insufficient to prove Stengel guilty beyond a reasonable doubt. First, the concept of what evidence is sufficient to establish guilt beyond a reasonable doubt in a criminal sex case has changed over the years. This change has produced confusing and seemingly contradictory rules. It has been held that in rape cases reviewing courts are especially charged with the duty of carefully reviewing the evidence. (*People v. Qualls* (1961), 21 Ill. 2d 252, 171 N.E.2d 612.) This concept is based on the fact that a rape charge is easy to make but difficult to defend. (*People v. Palmer* (1984), 125 Ill. App. 3d 703, 466 N.E.2d 640.) Courts have held that an accused's guilt in a criminal sex case must be so thoroughly established so as to exclude every other reasonable hypothesis. (*People v. Jenkins* (1983), 117 Ill. App. 3d 33, 452 N.E.2d 867.) Further, at one time in rape cases a complaining wit-

ness' testimony had to be corroborated. (*People v. Ritchie* (1948), 401 Ill. 542, 82 N.E.2d 344.) These rules would indicate a reversal in this case since Stengel's version of the event discloses a cozy sexual interlude gone awry when C.B. discovered that he was not the man he said he was.

However, in any critical review of evidence in a criminal case after conviction, an appellate court must view the evidence in a light most favorable to the prosecution, and after viewing the evidence in such a light, if proof of the essential element of a crime supports a conviction an appellate court must affirm. (*People v. Young* (1989), 128 Ill. 2d 1, 538 N.E.2d 453.) If the testimony of the complaining witness is clear and convincing, that testimony alone will be sufficient. (*People v. Raker* (1979), 75 Ill. App. 3d 975, 394 N.E.2d 852.) Clear and convincing evidence is not synonymous with uncontradicted or unimpeached testimony. (*People v. Palmer* (1984), 125 Ill. App. 3d 703, 466 N.E.2d 640.) If the victim's story is consistent and any discrepancies do not detract from its reasonableness, the victim's testimony can be clear and convincing. *People v. Thompson* (1978), 57 Ill. App. 3d 134, 140, 372 N.E.2d 1052, 1057.

Currently, relative to the issue of force, failure to cry out or failure to resist does not establish consent in sex cases if the woman is threatened or in fear of being harmed. Even disrobing and a plea not to be hurt have been held insufficient to negate force or lack of consent. *People v. Leonhardt* (1988), 173 Ill. App. 3d 314, 527 N.E.2d 562.

Stengel argues that the physical evidence in this case did not support C.B.'s claim of rape. There was no evidence of unusual trauma inconsistent with ordinary sexual intercourse. The medical evidence reflects there were no hematomas, her pelvis, vagina, and external genitalia appeared normal and without bruises, and her cervix was free of abrasions. "However, medical evidence of physical injury is not necessary to prove that an adult woman was forced to have sexual intercourse, and the lack of medical evidence of physical injury does not establish that she consented to have sexual intercourse." *People v. Leonhardt* (1988), 173 Ill. App. 3d 314, 321-22, 527 N.E.2d 562, 567.

A strange feature of this case is that Stengel's initial lawyer was a member of one of the State's most distinguished law firms, while at the same time C.B. was employed by that firm as a secretary. The record contains testimony of a representative of the firm who testified that when the firm learned of the preceding facts, the firm ceased representation of Stengel and C.B. was dismissed from her employment with the firm. The firm representative recalled C.B. asking if she could keep her job if she dropped the case. The representative said that he

could not talk to her about the matter any further. C.B. maintains that she never made the statement and she didn't like working for the firm anyway.

Stengel offered this testimony as evidence indicating C.B.'s version of events of the afternoon of December 5, 1986, was false. Stengel especially points to the fact that C.B. denies the statement and claims she didn't like working for the firm. However, the testimony also reveals that C.B. was called into the managing partner's office with no prior indication she was to be terminated. An equally valid inference was that C.B. was in shock. The representative's testimony shows that within a matter of 5 to 10 minutes C.B. was terminated, handed a final paycheck, and asked to leave. We do not agree with Stengel's argument that the statement C.B. made at this time proves C.B. was lying about the events of December 5, 1986.

▮▮ Whether the evidence is direct or circumstantial, the standard to be used in reviewing the sufficiency of evidence in all criminal cases is proof beyond a reasonable doubt. (*People v. Byrd* (1990), 206 Ill. App. 3d 996, 565 N.E.2d 176; *People v. Pintos* (1989), 133 Ill. 2d 286, 291, 549 N.E.2d 344.) " 'We will no longer require that in a case in which a sex offense is charged, the State must demonstrate either the victim's testimony is clear and convincing or substantially corroborated to prove guilt beyond a reasonable doubt.' " (*People v. Byrd*, 206 Ill. App. 3d at 1006, quoting *People v. James* (1990), 200 Ill. App. 3d 380, 394, 558 N.E.2d 732.) There is no legitimate reason to place additional requirements on the victims of sex crimes regarding how persuasive their testimony must be merely because of the nature of the crime. (*People v. James* (1990), 200 Ill. App. 3d 380, 394, 558 N.E.2d 732.) It is the function of the trier of fact, in this case the trial judge, to determine the accused's guilt or innocence, and a reviewing court will not reverse the conviction unless the evidence is too improbable as to justify a reasonable doubt of the defendant's guilt. (*People v. Phillips* (1989), 127 Ill. 2d 499, 509, 538 N.E.2d 500.) It is not the function of a reviewing court to retry the defendant. *People v. Phillips* (1989), 127 Ill. 2d 499, 509, 538 N.E.2d 500.

▮ The rule of proof beyond a reasonable doubt is whether C.B.'s testimony concerning Stengel's force or her consent was clear and convincing. Despite the inconsistencies, from the cold record before us, C.B.'s testimony concerning the actual acts that constituted the crime was clear and convincing. Based on the applicable standard of review, this court is bound to affirm the trial judge's finding of guilt. The trial judge was the one who heard the testimony and viewed the demeanor of the witnesses. The trial judge concluded that C.B.'s testimony,

rather than Stengel's, was more credible. We cannot say that the evidence was so improbable as to warrant a reversal of Stengel's conviction. Thus, we find that the evidence was sufficient beyond a reasonable doubt to support Stengel's conviction.

Stengel alleges that the trial court's undue restriction of defendant's cross-examination of C.B. denied him a fair trial. The defense speculated that C.B. accused Stengel of raping her after she learned he was not a doctor, having gone out with him behind her boyfriend's back because she thought Stengel had money. To establish this theory of defense and deprecate the credibility of C.B., the defense sought to show that C.B. had a history of dating men for money and that C.B.'s story about the December 5, 1986, lunch being a "business" luncheon was not true.

█ Stengel's first complaint is that the trial judge refused to allow cross-examination regarding the uniform C.B. wore at the bar where she worked. On that issue the following colloquy took place:

> "MR. MONICO [Defense Counsel]: Now, your uniform when you worked there was a low-cut tight body stocking, is that right?
>
> MR. PAYNTER [the State]: Objection. That's irrelevant.
>
> THE COURT: Sustained.
>
> MR. MONICO: Your uniform where you were a cocktail waitress was different than the uniform where the waitresses worked in the restaurant?
>
> MR. PAYNTER: Objection. Irrelevant.
>
> THE COURT: Mr. Monico, why is that relevant? ***
>
> MR. MONICO: I think it's relevant to what she was doing, in terms of her relationship with Mark. It's part of their relationship, how she is dressed when he saw her.
>
> THE COURT: How?
>
> MR. MONICO: It affects how they perceive each other.
>
> THE COURT: It's kind of stretching it.
>
> MR. MONICO: I'll withdraw it."

C.B. was not at work at the time she alleges she was raped. She was not wearing the uniform that she wore at work when she went to lunch with the defendant. The clothes that C.B. was wearing at the time of the rape were admitted into evidence. She was wearing a pink turtleneck sweater and a black and white checkered skirt. We feel that the trial court correctly ruled that C.B.'s work uniform was irrelevant to acts that took place in her apartment on December 5, 1986.

█ Defendant urges that he was not allowed to cross-examine C.B. regarding her cocaine use. Defense counsel asked C.B. whether

she knew what cocaine was and had she ever seen it. C.B. responded yes to both questions. Subsequently, the trial court sustained objections to the questions "Did you ever use it?" and "How many times have you seen it?" Following these questions defense counsel inquired if C.B. had drugs in her house on December 5, 1986. C.B. answered that she did not. She said that she did not have cocaine and marijuana in her house, and she denied talking to Stengel about cocaine that day.

In reviewing the record we find that defense counsel was permitted to ask questions about possible cocaine use on the date of the alleged rape. The trial court did not allow questions about possible cocaine use at an unspecified date. We do not find this to be an abuse of discretion.

Defendant claims that he was not allowed to inquire whether the police were notified before or after C.B. discovered that defendant lied to her about being a doctor. Defense counsel asked C.B. "Isn't it true that it was only after your boyfriend called the hospitals, and you found out that there was no Dr. Stengel there, that you decided to call the police?" The State objected to this question, and the trial court sustained the objection. However, following the objection, defense counsel asked C.B. a number of questions regarding the calls Jeff made attempting to find out if Stengel was a doctor or where he worked. After answering this line of questioning C.B. ultimately stated, "Yes, He's not a doctor, it's true. He doesn't work at the hospital, yes." Subsequently defense counsel asked, "It's only after that that you decided yes, let's call the police?" C.B. responded, "No, that's not what made me call the police. Maybe it happened in that order, which it did, but that was not the factor." Thus, C.B. testified that finding out defendant was not a doctor was not a factor in the decision to notify the police that she had been raped.

Defense counsel asked C.B. how long she had worked at a law firm before she began dating an attorney there. The court sustained an objection by the State. Defense counsel asserts that the inquiry into C.B.'s dating habits after the rape was material because the victim had a history of quickly attaching herself to men with money. The trial court ruled correctly. C.B.'s dating behavior months after the rape was too remote to be relevant.

Defendant alleges the trial court erred when it prevented defendant from asking C.B. if she stopped visiting her boyfriend in Memphis when his business there was failing. Defense counsel sought to convince the trial judge that the fact that the victim did not visit her boyfriend months after the rape was relevant to whether or not C.B. consented to sex with Stengel on December 5, 1986. We agree with the

trial court and find that whether or not C.B. visited her boyfriend in Memphis is not relevant to a decision as to whether or not Stengel raped her.

Defendant argues that it was error that he was not allowed to ask the victim whether she made more money than her live-in boyfriend. C.B. testified that she had discussed the fact that her boyfriend worked at a hot dog stand. C.B. did not know if she told Stengel that she was making more money than her boyfriend was making. She further testified that she would not tell Stengel that she had to pay the majority of the rent because she was making more money. Defense counsel then inquired, "It was true, wasn't it?" The victim answered, "No." The State objected on the basis that the question was irrelevant and argumentative.

■■ ■ "The activities under scrutiny by a trial court in a case alleging sexual assault must relate to the exchange between the complainant and the person accused, that is whether sexual attentions were forced upon another without consent." (*People v. Sandoval* (1990), 135 Ill. 2d 159, 176, 552 N.E.2d 726.) The Illinois Supreme Court has long noted that the latitude allowed on cross-examination and rebuttal is a matter within the sound discretion of the trial court; a reviewing court will not interfere unless there has been a clear abuse of discretion resulting in a manifest prejudice to the defendant. *People v. Sandoval* (1990), 135 Ill. 2d 159, 194, 552 N.E.2d 726; *People v. Collins* (1985), 106 Ill. 2d 237, 269, 478 N.E.2d 267; *People v. Peter* (1973), 55 Ill. 2d 443, 451-52, 303 N.E.2d 398.

■■ Upon review of the record, we find the trial court did not abuse its discretion and unduly restrict cross-examination resulting in prejudice to the defendant. C.B.'s dating habits since December 5, 1986, whether or not she made more money than her boyfriend and the uniform she wore at work have no relevance in a trier of fact's determination as to whether or not C.B. had been forced to have sex with the defendant.

■■ Finally, Stengel alleges that he did not receive a fair and impartial bench trial when the trial judge indicated, after announcing his verdict, that he felt defendant's counsel took a bench trial to take advantage of their friendship. Stengel asserts that the court perceived his election of a bench trial as some kind of abuse, a concern that put the judge at risk of inappropriately exaggerating his impartiality until he may have leaned over backwards to avoid the appearance of favoring defense counsel's client. Stengel urges that his conviction should be reversed because the trial judge should have recused himself. This court finds defendant's charges destitute of substantive merit. Nothing

in the record suggests that the trial judge was biased as a result of any friendship with defense counsel or that he took a slanted view of the evidence based on that friendship. No case law is cited to support the suggestion that a trial judge should recuse himself merely because of a friendly relationship with counsel. If that were the case, in every Illinois case outside of Cook County, almost every trial judge would have to recuse himself. In the less populated counties, the trial judge is often friendly with one or both of the attorneys before him.

The trial judge and defendant's attorney apparently were associated with each other through bar association and other law-related organizational activities. In a post-trial motion, defense counsel stated that the trial judge had told other defense attorneys and prosecutors that defense counsel had tried to take advantage of his friendship with the judge by requesting a bench trial. The trial judge stated that he did not remember making such a statement, but that he may have instead remarked regarding defense counsel's outburst when the verdict was announced.

When this question was raised, the trial judge immediately transferred the matter for reassignment to the chief judge. The chief judge assigned another judge to conduct a hearing on the matter. Thomas Knitter, an assistant public defender, testified that he was present when the trial judge made a statement to the effect that defense counsel took advantage of his friendship in having a bench trial in the Stengel case. Knitter testified that when making this statement the judge displayed a copy of a Justinian Society newsletter, which contained a photograph of the judge and defense counsel together at a function. Knitter could not recall the exact words of the trial judge nor could he recall who was present. Knitter further testified that the judge used a normal tone of voice and did not appear upset or angry.

The trial court denied defendant's recusal claim, finding that whatever the remark actually was, it had no bearing on the judge's ruling in the case. We agree with the trial court and deny defendant's request to reverse his conviction based on the failure to grant his post-trial motion.

Accordingly for the reasons set forth above, we affirm the decision of the trial court.

Judgment affirmed.

LORENZ, P.J., and GORDON, J., concur.