*In re* MARRIAGE OF SHERRY KANTAR, Petitioner-Appellant, and MICHAEL KANTAR, Respondent and Counterpetitioner (Albert Brooks Friedman, Ltd., Respondent-Appellee).

First District (3rd Division)   No. 1—89—3289

Opinion filed July 10, 1991.—Rehearing denied November 5, 1991.

GREIMAN, J., specially concurring.

Janet Rubel, of Northbrook, for appellant.

David M. Goldman, of Albert Brooks Friedman, Ltd., of Chicago, for appellee.

PRESIDING JUSTICE CERDA delivered the opinion of the court:

Petitioner, Sherry Kantar, appeals from an order granting her former divorce attorney's motion for summary judgment and denying her section 2—1401 petition (Ill. Rev. Stat. 1989, ch. 110, par. 2—1401) and her request for a hearing on attorney fees. She argues that: (1) there were genuine issues of material fact precluding entry of summary judgment; (2) she exercised due diligence in filing her section 2—1401 petition; (3) it was error not to grant the section 2—1401 petition, whether or not she exercised due diligence, because she alleged sexual misconduct by her divorce attorney and that the attorney fees were obtained as a result of undue influence, breach of fiduciary duty, coercion, duress, and fraud; (4) she had an absolute right to a hearing on the attorney fees awarded to her divorce attorney because she questioned the reasonableness of the fees; and (5) her divorce attorney breached a fiduciary duty by engaging in a sexual relationship with her while representing her.

Petitioner's attorney, Albert Brooks Friedman, Ltd. (Friedman, Ltd.), filed a petition for dissolution of marriage on her behalf on May 24, 1985. A prove up hearing was held on March 31, 1988, and petitioner's attorney, David M. Goldman, who was an attorney with Friedman, Ltd., asked petitioner the following questions concerning attorney fees and was given the following responses:

"Q. You also agreed that you each will be responsible for your own attorney's fees; is that correct?

A. Yes.

Q. You have agreed today that you will be responsible for the sum of Fifteen Thousand Five Hundred Dollars ($15,500.00) to Albert Brooks Friedman, Ltd.?

A. Yes.

Q. You also agreed that the judgment will be entered against you today in that amount in favor of Albert Brooks Friedman, Ltd.?

A. Yes.

Q. Prior to agreeing to, you had an opportunity to discuss the attorney's fees with myself and Mr. Friedman in his office; is that correct?

A. Yes.

Q. We gave you an itemized statement?

A. Yes.

Q. You have had an opportunity to review that statement?

A. Yes.

Q. Do you believe those fees incurred in this matter were fair and reasonable?

A. Yes.

Q. You understand that you have a right to have a hearing on your attorney's fees; is that correct?

A. Yes.

Q. Knowing you have a right to a hearing on your attorney's fees, you are agreeing to waive that right and have the judgment entered here today; is that correct?

A. Yes.

\* \* \*

Q. Throughout the proceedings two lawyers from our office have represented you, Mr. Friedman and myself; is that correct?

A. Yes.

Q. You are satisfied with our representation; is that correct?

A. Yes.

\* \* \*

Q. Do you have any questions about this agreement at this time?

A. No."

On the same date, judgment was entered in favor of Friedman, Ltd., for $15,500.

The settlement agreement provided that each party was to be responsible for his own attorney fees and that the petitioner was responsible for the payment of the balance of her attorney fees of $15,500 to Friedman, Ltd. A judgment of dissolution of the marriage was entered on April 5, 1988.

On June 17, 1988, Michael Kantar, petitioner's former husband, filed a petition for rule to show cause alleging that petitioner violated the judgment of dissolution. A section 2—1401 petition and a supporting affidavit were filed on June 21, 1988, by petitioner's new attorney, Grace Wein. A copy of the petition was mailed to, but not served upon, Friedman, Ltd., on the same date. The notice of motion stated that on July 8, 1988, petitioner would present both her response to the petition for rule to show cause and her section 2—1401 petition. Also on June 21, 1988, Wein filed an appearance and petitioner's response to Michael Kantar's petition for rule to show cause.

On July 1, 1988, Friedman, Ltd., moved for, and was given, leave to withdraw as petitioner's attorney on the basis of irreconcilable differences between it and petitioner as to the conduct of the litigation. Petitioner argues on appeal that Friedman, Ltd., was not given leave to withdraw, but the order appears in the supplemental record. Also on July 1, 1988, Michael Kantar filed a petition for rule to show cause and a petition for sanctions and attorney fees. On August 3, 1988, petitioner filed an emergency motion to reschedule the August 5, 1988, hearing, which apparently was related to the section 2—1401 petition because notice of the emergency motion was given to Friedman, Ltd., in addition to Michael Kantar. On August 3, 1988, Michael Kantar filed a motion to strike and dismiss the section 2—1401 petition and a motion to strike petitioner's supporting affidavit. The August 5, 1988, hearing date was continued to August 19, 1988. On August 10, 1988, Michael Kantar filed a petition for rule to show cause to be heard on August 19, 1988. On August 22, 1988, the hearing on the petitions for rule to show cause was continued to August 30, 1988.

On September 1, 1988, Michael Kantar's petition for rule to show cause, petition for sanctions, and petition to strike were dismissed and withdrawn with prejudice, and petitioner's section 2—1401 petition was dismissed with prejudice and withdrawn only as against Michael Kantar. On the same date, petitioner was given leave until November 1, 1988, to file an amended section 2—1401 petition, attorney Wein was given leave to withdraw, and a new attorney, Glen Kaufman, was given leave to file an appearance for petitioner.

Petitioner filed a *pro se* amended section 2—1401 petition on October 31, 1988, and another supporting affidavit on March 10, 1989. A notice of filing by Kaufman stated that on March 10, 1989, petitioner filed a "supplemental petition to vacate," but the petition does not appear in the record. On March 13, 1989, petitioner filed a motion to compel the appearance of David Goldman at an April 14, 1989, hearing, and filed a notice to take Friedman's deposition on March 20, 1989. On March 17, 1989, Friedman, Ltd., filed a motion to strike the supplemental petition to vacate which argued, in part, that no due diligence had been shown and that the original petition had not been served upon the law firm.

On May 15, 1989, petitioner filed a consolidated amended and supplemental petition to vacate. A copy was mailed to Friedman, Ltd. In part she alleged that: (1) she never willingly or knowingly agreed to pay to Friedman, Ltd., $15,500 for attorney fees; (2) the agreement to pay the attorney fees was procured by undue influence, coercion, misrepresentation, and intimidation; (3) the request for $15,500 in additional at-

torney fees was unconscionable and unfair; (4) Friedman, Ltd., repeatedly threatened to withdraw from representation if petitioner did not acquiesce to the demands of her husband; (5) the attorney fees were unreasonable and arbitrary without any basis in the amount of work performed; (6) a few days prior to the prove up, an attorney from Friedman, Ltd., stated to petitioner that if she did not sign the judgment for dissolution, she would lose everything and that the result could not be rectified; (7) on the day of the signing of the judgment for dissolution, petitioner had been in court for approximately six hours during which time an attorney from Friedman, Ltd., stated to her that she would have to negotiate her case on her own if she did not agree to its terms and that the bill would remain the same nevertheless; (8) Goldman told her on the day of the prove up that she could not get divorced unless she agreed to pay the fee; (9) she and Friedman engaged in sexual relations at least 20 times prior to the entry of the judgment of dissolution; (10) the billing statement contained fraudulent and untruthful entries about the time spent; (11) legal fees were billed for time during which petitioner and Friedman engaged in sexual relations and for personal telephone calls to her; (12) after she requested an itemized billing statement, Friedman stated that the fee would be $15,000 regardless of whether she received a statement; (13) the billing statement was handed to petitioner 10 minutes prior to the prove up hearing; (14) although requested to do so, neither Friedman nor anyone from his firm ever discussed the accuracy or legitimacy of the fee request; (15) as a result of being seduced, she was incapable of making a meaningful decision with regard to the payment of attorney fees on the day of the prove up; (16) at the time of the prove up, she was under extreme duress as a result of her relationship with Friedman; and (17) she exercised due diligence by filing the first petition within 60 days of the entry of the judgment of dissolution. Petitioner's supporting affidavit was filed with the petition. The affidavit and petition did not repeat the allegations contained in the affidavit supporting the first petition that on April 13, 1988, petitioner spoke to Friedman and indicated her dissatisfaction with the settlement and that Friedman refused to take any legal action.

On June 9, 1989, Friedman, Ltd., filed a motion for summary judgment (Ill. Rev. Stat. 1989, ch. 110, par. 2—1005). It argued that: (1) petitioner did not exercise due diligence in presenting the petition; and (2) the petition did not allege why petitioner did not move within 30 days to vacate the judgment. Friedman, Ltd., attached to a subsequent pleading a copy of a statement for its services dated July 18, 1986, for $5,377.50, less a $2,000 retainer fee. In addition, attached was a copy of a March 31, 1988, itemized statement of services rendered from January 16,

1985, through March 31, 1988, which stated a total of $22,150.50 that was reduced by a retainer fee of $4,500 which was further adjusted "per agreement" to $15,500. From this latter amount, deducted were a $1,615 payment made March 31, 1988, and a $50 delivery charge, and the final balance was $13,835.

The motion for summary judgment was granted on September 28, 1989. On October 10, 1989, petitioner filed a motion to reconsider. On October 26, 1989, petitioner filed a petition for a hearing to determine the appropriateness of the attorney fees. On October 30, 1989, both motions were denied and an order was entered that petitioner owed to Friedman, Ltd., $13,835 plus 9% interest for a total of $16,392.71.

Respondent argues on appeal that petitioner never exercised due diligence in filing her section 2—1401 petition, that the first section 2—1401 petition was not served as required by Supreme Court Rules 105 (134 Ill. 2d R. 105) and 106 (134 Ill. 2d R. 106), and that because service was not achieved until February 24, 1989, the original and amended petitions were nullities until that date.

In the motion to strike the petition to vacate, Friedman, Ltd., argued the merits by stating that petitioner's allegations of sexual relations were a scurrilous attack and that many allegations were irrelevant, nonsensical, conclusory, and contained no information. The motion to strike further stated there was no allegation made that $2,000 paid by petitioner was not properly credited to her account.

■ We hold that any objection to service of the section 2—1401 petition was waived by Friedman, Ltd.'s response to the merits of the petition in its motion to strike. See *Slade v. Bowman* (1977), 49 Ill. App. 3d 242, 246, 364 N.E.2d 922, 925 (defects of service of petition to vacate were waived when defendant generally appeared to argue the motion).

■ A section 2—1401 petition must set forth specific factual allegations supporting these elements: (1) the existence of a meritorious defense or claim; (2) due diligence in presenting the defense or claim to the circuit court in the original action; and (3) due diligence in filing the petition. (*Smith v. Airoom, Inc.* (1986), 114 Ill. 2d 209, 220-21, 499 N.E.2d 1381, 1386.) The following are the relevant dates in determining if petitioner exercised due diligence in filing her petition: (1) the prove up hearing was held on March 31, 1988; (2) the judgment of dissolution was entered on April 5, 1988; (3) petitioner indicated to Friedman her dissatisfaction with the settlement and Friedman refused to take action on April 13, 1988; (4) the first section 2—1401 petition was filed on June 21, 1988; and (5) Friedman, Ltd., moved for leave to withdraw as petitioner's attorney, and leave was granted, on July 1, 1988.

None of the section 2—1401 petitions specifically alleged how petitioner exercised due diligence in filing the petition about 11 weeks after the judgment was entered, but petitioner alleged that eight days after the judgment was entered, she discussed with Friedman her dissatisfaction with the judgment. The record shows that after he refused to take legal action, she hired a new attorney within 10 weeks at the latest because that is how much later the section 2—1401 petition was filed.

■ We hold that petitioner exercised due diligence in filing the section 2—1401 petition because she had to hire a new attorney in order to file a petition alleging Friedman, Ltd.'s wrongful conduct in connection with the attorney fees judgment sought to be vacated. See *Chastain v. Chastain* (1986), 149 Ill. App. 3d 579, 582, 500 N.E.2d 998, 1000 (due diligence exercised where section 2—1401 petition was filed three months after judgment and where petitioner changed attorneys before filing the petition); *In re Marriage of Pagano* (1989), 181 Ill. App. 3d 547, 557, 537 N.E.2d 402, 404 (due diligence exercised where a section 2—1401 petition to challenge attorney fees award in divorce case was filed two months after the judgment and where petitioner had to retain new counsel); *In re Marriage of Pitulla* (1986), 141 Ill. App. 3d 956, 960, 491 N.E.2d 90, 93 (the dismissal of a section 2—1401 petition for the lack of due diligence was reversed on the partial basis that the client diligently pursued out-of-court methods to settle her dispute with her divorce attorney about the amount of the attorney fees).

■ When attorney fees from a client are sought in a dissolution of marriage lawsuit, the attorney and client are in an unusual situation:

> "While section 508 [of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1981, ch. 40, par. 508)] permits judicial economy by eliminating the need for an attorney to sue his own client in a separate action to obtain a judgment for his attorney fee, we must not lose sight of the fact that it also places an attorney and his client in adversary positions during the course of court proceedings. Moreover, the situation presents a circumstance where the client is not represented by counsel although he or she is being opposed by counsel on a matter in which a judgment may be entered against a client. Plainly, what is permitted by section 508 is unique in, and is otherwise inimical to, the legal profession." *Pitulla*, 141 Ill. App. 3d at 961, 491 N.E.2d at 93.

The relationship between a client and his attorney was also commented on in *In re Marriage of Pagano* (1989), 181 Ill. App. 3d 547, 555, 537 N.E.2d 398, 403:

> "Because section 508 [of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1985, ch. 40, par. 508)] puts clients

in a position where they are effectively before the court without representation, we are of the opinion that precautions must be taken to ensure that any rights of the client are not relinquished unknowingly and that any resulting attorney fee is fair."

We note that on March 31, 1988, shortly before the prove up of her divorce case, petitioner was presented with an itemized statement of attorney fees. The statement covered the period of January 16, 1985, through March 31, 1988, and consisted of eight pages and included 131 items. It is doubtful that petitioner could make a meaningful examination of the statement. She alleged that she only had a short time to examine and approve the statement before proceeding to the prove up hearing. She alleged that no one ever responded to her request to discuss the accuracy or legitimacy of the fee request. Petitioner included in her petition the allegation that the billing statement contained untruthful and unnecessary time spent by Friedman. Because the petition as a whole contains sufficient allegations of improprieties, petitioner is entitled to a hearing to decide the correct amount of attorney fees she should pay.

■ The facts that the client is no longer represented and is in an adversarial position with the attorney when he seeks his fees from the client were relied upon by *Pagano* (181 Ill. App. 3d at 557, 537 N.E.2d at 404), which stated that a hearing on the section 2—1401 petition alleging attorney impropriety should be granted even in the absence of due diligence. We need not determine whether due diligence is required where there are allegations of attorney impropriety, but we note the authority that holds that section 2—1401 relief can be granted in the absence of due diligence if required in the interests of justice. *E.g., Zee Jay, Inc. v. Illinois Insurance Guaranty Fund* (1990), 194 Ill. App. 3d 1098, 1103, 552 N.E.2d 1027, 1031.

The issue whether the alleged sexual relationship breached the attorney's fiduciary duty also is not reached because the alleged attorney fees' impropriety alone would be a sufficient reason, if proven, to vacate the judgment. See *Davis v. Chicago Transit Authority* (1980), 82 Ill. App. 3d 987, 989, 403 N.E.2d 615, 616 (purpose of petition to vacate is to bring before the court facts not appearing on the record which, if known to the court at the time the judgment was entered, would have prevented its rendition).

■ We also hold that the trial court erred in entering summary judgment in favor of Friedman, Ltd., because there were genuine issues of material fact, *e.g.*, whether the charged attorney fees were accurate. Also, the entry of summary judgment was inappropriate because the

merits of the petition were not reached by the trial court, which only held that petitioner had not exercised due diligence in filing the petition.

The judgments of the circuit court entering summary judgment and awarding $16,392.17 in attorney fees are reversed, and the cause is remanded.

Reversed and remanded.

RIZZI, J., concurs.

JUSTICE GREIMAN, specially concurring:

I concur with the result reached by the majority in reversing the trial court, but believe the attorney's alleged sexual misconduct, if it is misconduct, should be considered.

Petitioner, a client of the respondent, filed a section 2—1401 petition 77 days after the entry of the decree of dissolution, which established petitioner's liability to respondent for attorney fees.

The petition alleges improprieties in the computation of attorney fees as well as improper conduct by respondent or his employees in the period immediately prior to and during the approval of the fees by the trial court.

Additionally, petitioner alleges she and respondent engaged in sexual relations at least 20 times prior to the entry of the judgment of dissolution and during the time respondent acted as her counsel.

Petitioner's section 2—1401 petition was dismissed by the trial court for lack of due diligence in presenting the petition and that service on respondent was not properly perfected. The majority rightly recognizes that respondent's response on the merits to the petition waives the alleged defect in service and after a careful analysis of petitioner's actions concludes that petitioner exercised due diligence in filing the section 2—1401 petition.

The court correctly followed *In re Marriage of Pagano* (1989), 181 Ill. App. 3d 547, 537 N.E.2d 398, and *In re Marriage of Pitulla* (1986), 141 Ill. App. 3d 956, 491 N.E.2d 90, which provided that petitioner's need for time to retain new counsel and out of court settlement discussions satisfied the due diligence requirements and further acknowledged that under *Pagano* (181 Ill. App. 3d 547, 537 N.E.2d 398), a section 2—1401 petition which alleges an attorney's impropriety or misconduct should be granted a hearing even in the absence of due diligence if required in the interest of justice.

Since the requirement of due diligence is not imposed by statute, but rather by judicial mandate, it is perfectly appropriate for this court

to carve out a significant exception to the requirement of due diligence where there is an allegation of a sexual relationship between a domestic relations lawyer and client which I believe constitutes a *per se* conflict of interest.[1]

While the majority declines to address the import of the alleged sexual liaison between petitioner and respondent, I believe that the precedential value of this case should be consideration of the legal profession's "dirty little secret."[2]

We conjure up with ease the client entering her lawyer's office. Her marriage has collapsed and she is concerned about her failed relationship. Perhaps she has been rejected by her spouse. More often than not, she has serious financial problems which may present her with areas of stress with which she has not previously been required to cope. Her children may be severely disturbed over the failed marriage and the pulling and tugging by the parents which is generally attendant to these situations. As she walks through the door of the office, at last she finds

---

[1]Section 2—1401 of the Illinois Code of Civil Procedure is substantially the same as was contained in the previous section 72 of the Illinois Civil Practice Act (Ill. Rev. Stat. 1981, ch. 110, par. 72). Both have their roots in the writ of error *coram nobis* which required due diligence on the part of the person seeking the writ. *M.L.C. Corp. v. Pallas* (1978), 59 Ill. App. 3d 504, 375 N.E.2d 560; *Diacou v. Palos State Bank* (1976), 65 Ill. 2d 304, 357 N.E.2d 518.

[2]About 1% of the 5,000 complaints which the Illinois Attorney Registration and Disciplinary Commission received during 1989 involved attorney-client sexual encounters. The ARDC determined that the problem is "a systematic, unchanging and consistent trend" in the domestic relations field. (Illinois Gender Bias Task Force, Illinois Task Force on Gender Bias in the Courts, at 54 (1990) (hereinafter cited as Task Force).) The Task Force expresses its concern about sexual relationships between domestic relations attorneys and their clients and states: "(1) the likelihood that the client is in a vulnerable emotional state and that the sexual relationship may increase her emotional dependency; (2) the possibility that the result of this increased emotional dependency is that the client is not able to give full voluntary and informed consent either to the relationship or to continued representation by the attorney; (3) the possibility that the attorney-client relationship may prevent any possible reconciliation between the client and her husband; (4) the inability to anticipate how the client's spouse might react to the relationship if he were to find out, and how this discovery would affect the negotiation of property rights in their divorce and, if children are involved, the client's right to custody; and (5) the possibility that the attorney may breach the fiduciary relationship with the client by being unable to render competent representation without a conflict of interest." Task Force at 55; see also Dubin, *Sex and the Divorce Lawyer: Is the Client Off Limits*, 1 Geo. J. of Legal Ethics, 585, 589 (1988).

someone who cares about her problem, someone who will protect her legally and someone whom she can trust.

Not every woman involved in matrimonial litigation fits the stereotype of a vulnerable person without knowledge of her rights, who relies in an emotional way upon her lawyer. Women in divorce, if they so choose, and lawyers, like everyone else, are generally not restrained from engaging in adult consensual sexual relations.

Having made that observation, however, no citation is needed to state that women involved in matrimonial litigation are often emotionally vulnerable. They feel the pain of divorce and search for a champion for their rights and for the rights of their minor children. They place a heavy reliance on the fact that their lawyer will work in their best interest.

In Illinois, a divorce lawyer who has sexual intercourse with his client has engaged in a *per se* violation of rules governing conflict of interest. The Illinois Supreme Court has not adopted a rule exclusively dealing with sexual relations between attorney and client. However, Rule 1.7 (Conflict of Interest) or Rule 3.7 (Lawyer as Witness) may be sufficient to regulate such conduct.[3] Illinois Rules of Professional Conduct, 134 Ill. 2d Rules 1.7, 3.7.

Generally, an attorney who benefits from a transaction with a client must show that the transaction was fair, equitable and just and that it did not proceed from undue influence. To prove that the benefit received did not proceed from undue influence, the attorney must prove that he made a full and frank disclosure of all relevant information, that the consideration was adequate, and that the client had independent advice before completing the transaction. (*In re Imming* (1989), 131 Ill. 2d 239, 545 N.E.2d 715.) It is hardly likely that a lawyer about to begin a sexual relationship with a client would meet that rigorous test.[4]

---

[3]Conduct prior to August 1, 1990, would have been governed by Rule 1—102 (Misconduct) or Rule 5—101 (Conflict of Interest) or Rule 5—102 (Lawyer as Witness) of the Code of Professional Responsibility repealed August 1, 1990. 107 Ill. 2d Rules 1—102, 5—101, 5—102.

[4]A proposal to the California Bar would have required the lawyer to provide informed consent to the client by advising her of the potential pitfalls of a lawyer-client sexual experience and suggesting that the client discuss the matter with a second lawyer and sign a written waiver. (Bishop, *Cracking Down on Sex with Clients*, N.Y. Times, March 15, 1991, §B (Law), at 16, col. 3.) This would appear to be the legal equivalent of a cold shower!

Moreover, the activity or conduct which is proscribed need not be explictly prohibited by the canons of ethics. *In re Lamberis* (1982), 93 Ill. 2d 222, 443 N.E.2d 549 (censure for plagiarism).

Although Illinois has adopted "no fault" divorce (Ill. Rev. Stat. 1989, ch. 40, par. 401(a)(2)), adultery remains one of the several grounds upon which a dissolution may be sought (Ill. Rev. Stat. 1989, ch. 40, par. 401(a)(1)). Adultery with her lawyer has provided the husband with grounds for divorce. A lawyer is required to act in the best interest of the client, and if called upon to testify, the lawyer would be required to give testimony contrary to the best interests of such client. (*In re Marriage of Lee* (1985), 135 Ill. App. 3d 509, 481 N.E.2d 1045; *People v. Chatman* (1982), 105 Ill. App. 3d 276, 434 N.E.2d 309; *People v. Hill* (1978), 56 Ill. App. 3d 510, 371 N.E.2d 1257.) His testimony might adversely affect child custody and might have some impact on the distribution of property, prohibitions in that regard to the contrary notwithstanding.

A lawyer is a fiduciary and his client's best interests must be first and foremost on his mind. Illinois has a strong public policy favoring reconcilation.[5] Could a lawyer who had spent the night with his client enter the office in the morning to discuss the possibility of reconciliation of his client with her husband?

Further, the relationship might affect the attorney-client privilege with respect to communications passing between them. Generally, the privilege does not extend to communications made to an attorney in any other capacity than as an attorney for the party making the communication. (*Dickerson v. Dickerson* (1926), 322 Ill. 492, 153 N.E. 740.) Hence, some tidbit of information gleaned during their personal time together might eliminate one of the essen-

---

[5]In 1955 the General Assembly enacted then section 6a (Ill. Rev. Stat. 1955, ch. 40, par. 7a) which provided for commencement of divorce actions by *praecipe* and the filing of a complaint 60 days thereafter to encourage reconciliation during a cooling off period. In 1961, the "litigate by day, copulate by night" statute was passed encouraging litigants to reconcile during the pendency of litigation and not lose their respective grounds for relief. (Ill. Rev. Stat. 1961, ch. 40, par. 21.2.) A similar provision appears in our "No Fault" statute. (Ill. Rev. Stat. 1987, ch. 40, par. 401(a)(2).) Courts may order litigants to attend conferences and counselling if the court or any party concludes that there is a prospect of reconciliation. (Ill. Rev. Stat. 1987, ch. 40, par. 404(a); Cir. Ct. Cook County R. 13.4(f)(iii)(A).) Additionally, the Illinois legislature provided in the preamble of the Illinois Marriage and Dissolution Act of 1977 that one of the avowed purposes of the Act is to "strengthen and preserve the integrity of marriage and safeguard family relationships." Ill. Rev. Stat. 1987, ch. 40, par. 102(2).

tial elements to maintain the lawyer-client privilege. *People v. Adam* (1972), 51 Ill. 2d 46, 280 N.E.2d 205.

A lawyer who has engaged in sexual relations with his client has provided a conflict of interest which may require him to testify adversely to his client's best interests, place the client in a more difficult position with respect to resolution of the issues in the domestic relations case, possibly impair the attorney-client privilege as to communications between them, and make it difficult to pursue the client's interests with the appropriate kind of zeal and objectivity required by the canons of ethics.

Lawyers who engage in sexual relations with their clients are living on the edge. They might face (i) disciplinary proceedings before the ARDC or (ii) be subject to a malpractice case,[6] or (iii) release of the client from the payment of any fees or sums which may be due or require return of monies paid for services rendered after the act of sexual intercourse. These three remedies are not mutually exclusive and a client could pursue all three.

The Illinois Senate has adopted a resolution directing the Illinois Supreme Court to adopt a rule of professional conduct which would deal with such behavior.[7] However, while such an amendment might be an appropriate statement on the issue, I believe the present rules governing professional conduct may be adequate.

The case at bar deals only with the appropriateness of the attorney fees charged petitioner. Issues of malpractice and discipline

---

[6]It is not clear that malpractice will be an easy road to follow since *Suppressed v. Suppressed* (1990), 206 Ill. App. 3d 918, 565 N.E.2d 101. (See also Warden, *Secret Suits*, Chicago Lawyer, April 18, 1989, at 1, col. 2; Wisniewski, *Sex With Clients An Unfair Affair*, Chicago Daily Law Bulletin, April 20, 1991, at 1, col. 5.) Different rules may apply to health care providers. *Corgan v. Muehling* (1988), 167 Ill. App. 3d 1093, 522 N.E.2d 15, *aff'd* (1991), 143 Ill. 2d 296.

[7]Although Illinois has not adopted a specific rule, California recently drafted a rule which, if approved by the California Supreme Court, would prohibit sexual relations with clients if there is no coercion, intimidation or undue influence when entering into the sexual relationship and continuing representation if the sexual relations would reflect on his ability to perform legal services in a competent manner. The rule does not apply to lawyer-client sexual relations predating the initiation of the lawyer-client relationship and it presents only a presumption that the rule has been violated. Rule 3—120 of the Business and Professional Code of California.

must be left to another forum.[8] Accordingly, a domestic relations client ought to be freed of the obligation of paying attorney fees from and after the time that the lawyer has a conflict of interest.

Illinois Law and Practice states: "An attorney may be deprived of compensation because *** he has represented adverse, conflicting and antagonistic interests in the same litigation. *** Unprofessional conduct has some effect on attorneys fees and in some cases, may be a complete bar to any recovery." 4 Ill. L. & Prac. *Attorneys and Counselors* §124, at 211 (1971).

This court may refer to the rules of professional conduct as a reliable guide to what constitutes unprofessional conduct on the part of an attorney and upon such reference may determine that there ought to be a complete bar to any recovery of attorney fees. *Talley v. Alton Box Board Co.* (1962), 37 Ill. App. 2d 137, 185 N.E.2d 349.

Illinois courts have often been willing to set aside agreements for the payment of legal fees if they are violative of public policy. *O'Hara v. Ahlgren, Blumenfeld & Kempster* (1989), 127 Ill. 2d 333, 537 N.E.2d 730 (payment to deceased law partner's surviving spouse); *Phillips v. Joyce* (1988), 169 Ill. App. 3d 520, 523 N.E.2d 933 (fee-splitting agreements); *Leoris v. Dicks* (1986), 150 Ill. App. 3d 350, 501 N.E.2d 901.

There are those who will argue that such a rule invites mischief and perjury. I note, however, that conviction for sexual assault can be obtained upon the testimony of the complainant alone without corroboration. (*People v. Stengel* (1991), 211 Ill. App. 3d 337, 570 N.E.2d 391.) Surely, if one's liberty can be forfeited without corroboration, a lawyer's fee ought to suffer the same fate upon a proper showing.

---

[8]Lawyers disciplined for sexual advances to their clients: *In re Stanton* (1985), 103 N.M. 413, 708 P.2d 325; *State v. Heilprin* (1973), 59 Wis. 2d 312, 207 N.W.2d 878; *Cincinnati Bar Association v. Fettner* (1983), 8 Ohio St. 3d 17, 455 N.E.2d 1288; *State of Michigan Attorney Disciplinary Board v. Gold* (June 30, 1981), File No. DP 18/81; *In re Adams* (Ind. 1981), 428 N.E.2d 786; *In re Merrifield*, before the Comm. on Legal Ethics of the W.Va. State Bar, L.E.C. 85—12 (March 27, 1986); *In re Gibson* (1985), 124 Wis. 2d 466, 369 N.W.2d 695; *Committee on Professional Ethics & Conduct of Iowa State Bar Association v. Durham* (Iowa 1979), 279 N.W.2d 280. Trading sexual favors for legal services: *In re Wood* (1976), 265 Ind. 616, 358 N.E.2d 128; *In re Howard* (1984), 297 Or. 174, 681 P.2d 775. Grant of custody to husband where wife had moved in with lawyer: *In re Marriage of Lehr* (1978), 36 Or. App. 23, 583 P.2d 1157. Suit against lawyer for failure to use condom: *Barbara A. v. John G.* (1983), 145 Cal. App. 3d 369, 193 Cal. Rptr. 422 (partial compilation set out in Dubin, *Sex and the Divorce Lawyer: Is the Client Off Limits*, 1 Geo. J. of Legal Ethics 585 (1988)).

It ought to be no defense that the lawyer has handled or negotiated the matter in a lawyerlike fashion or otherwise properly accounted for himself in accordance with the best of his abilities. The sexual relationship between lawyer and client in a divorce setting is inherently an exploitive situation. The sexual relationship with a client always constitutes a conflict of interest, and as Jeffrey C. Hazard, Jr., of the Yale Law School wrote in The National Law Journal, April 15, 1991:

"If the sexual relationship is emotionally serious, the lawyer cannot be dispassionate about the client's legal problems. If the relationship is not emotionally serious, the lawyer may be exploiting the client. Of course, there can be cases where the relationship is genuine and not exploitive. But the probabilities are stronger the other way. Hence, a *per se* rule might be justified ***. The concept of a *per se* rule is not unheard of in conflict-of-interest matters."

I believe the sexual relationship between matrimonial[9] lawyer and client contaminates their professional relationship and establishes a *per se* conflict of interest which would render his fees forfeit where the client brings the matter to the attention of the court within a reasonable time and provides evidence sufficient to carry her burden of proof.

[9]I make no determination as to a *per se* rule with respect to patent lawyer and inventor; real estate lawyer and developer; personal injury lawyer and injured plaintiff; corporate lawyer and CEO or any of the innumerable other possible combinations nor do I determine whether the lawyer is entitled to fees accrued or received prior to their sexual relationship.